UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

WESTERN DIVISION (TOLEDO)

| | | |
|---|---|---|
| HAWAII IRONWORKERS ANNUITY TRUST FUND, on Behalf of Itself and All Others Similarly Situated, | ) ) ) | No. |
| | ) | CLASS ACTION |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| BERNARD N. COLE, WILLIAM E. HENNESSY, DOUGLAS W. HODGE and ROBERT E. STEIMLE, | ) ) ) ) | |
| Defendants. | ) ) ) | |
| | ) | DEMAND FOR JURY TRIAL |

CLASS ACTION COMPLAINT FOR VIOLATION OF THE
SECURITIES EXCHANGE ACT OF 1934

LANDSKRONER • GRIECO • MADDEN, LLC
JACK LANDSKRONER (0059227)
1360 West 9th Street, Suite 200
Cleveland, OH  44113
Telephone:  216/522-9000
216/522-9007 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
MICHAEL J. DOWD
DEBRA J. WYMAN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Liaison Counsel

Counsel for Plaintiff

## INTRODUCTION

1.      This securities fraud class action is brought on behalf of persons who purchased the publicly traded securities of Dana Corporation ("Dana" or the "Company") between February 23, 2005 and October 7, 2005 (the "Class Period").[1]  This case is brought against Bernard N. Cole ("Cole"), William E. Hennessy ("Hennessy"), Douglas W. Hodge ("Hodge") and Robert E. Steimle ("Steimle") (collectively "defendants"), each of whom served during the Class Period as a senior insider in Dana's Heavy Vehicle Technologies and Systems Group ("Heavy Vehicle Group") and/or its Commercial Vehicle System  ("CVS") division.  This action arises out of a fraudulent scheme and wrongful course of business whereby defendants caused Dana to issue false financial statements for fiscal 2004 and the first two quarters of 2005.

2.      By at least February 23, 2005 and continuing through the end of the Class Period on October 7, 2005, defendants fraudulently manipulated the reported earnings and financial performance of the Heavy Vehicle Group and its CVS division, which conduct was designed to and did cause Dana to issue false releases and file false reports with the Securities and Exchange Commission ("SEC").

3.      Defendants caused Dana to falsify its financial results during the Class Period by, among other things, utilizing sham transactions, creating and disseminating false invoices, failing to record steel surcharges and improperly recognizing revenue on price increases not agreed to by Dana's customers.  Defendants' actions caused Dana to materially overstate the Company's reported earnings by as much as 38% during the Class Period.

---

[1]      During the Class Period, Dana was a supplier of automotive parts and drive train systems for light, commercial and off-highway vehicles.  Dana filed for Chapter 11 bankruptcy protection on March 3, 2006.  Upon its emergence from Chapter 11, Dana's business and assets were assumed by Dana Holding Corporation.

506277_1

4.     In September 2005, the price of Dana's securities dropped precipitously as the truth about Dana's actual operating performance began to reach the market.  Thereafter, Dana admitted that its results for fiscal year 2004 ("FY04"), first quarter 2005 ("1Q05") and second quarter 2005 ("2Q05") had been falsified and that the quarterly profits defendants caused Dana to report during the Class Period had been overstated due to defendants' misconduct.

5.     On March 3, 2006, the Company was forced to file for protection under the U.S. Bankruptcy Code.  Prior to filing for bankruptcy, in February 2006, the Company disclosed that the SEC had commenced a formal investigation into Dana's accounting practices.  On September 11, 2009, the SEC announced that Dana had consented to the entry of a cease and desist order that outlined a fraudulent scheme committed by defendants as well as the dearth of Dana's financial safeguards that should have prevented the malfeasance.  That same day, the SEC filed a civil action against defendants outlining their accounting manipulations and the resulting inflation of Dana's reported financial results.  Defendants agreed to settle these claims with the SEC, paying a total of almost $400,000 in disgorgement, pre-judgment interest and civil penalties.  As part of the settlement, Hodge and Cole were also barred for five years from serving as officers or directors of any public company.

6.     Plaintiff and the Class have suffered hundreds of millions of dollars in damages as they purchased Dana securities at artificially inflated prices and the price of Dana's common stock – which traded as high as $16.72 during the Class Period – fell to $6.04 per share on October 7, 2005.

## SUMMARY OF THE ACTION

7.     On February 17, 2004, Dana announced its financial results for fiscal year 2003 ("FY03"), reporting a 220% increase in net income.  On February 20, 2004, Fitch, Inc. initiated

- 2 -

coverage on the Company and assigned a rating of BB with positive rating outlook based on the strength of Dana's FY03 results.[2]  According to Fitch:

> The rating reflects an improved operating profile and a strengthening balance sheet characterized by significant debt reduction and healthy cash balances.  Over the past several years, Dana has sharpened its strategic focus which has resulted in significant restructuring and divestiture programs.  Restructuring actions have led to enhanced margins while divestitures have strengthened the balance sheet.

8.     On March 1, 2004, Michael J. Burns ("Burns") became Dana's Chairman and CEO. Burns' hiring was cast as an extremely positive development, as Burns was touted as a strong executive who could slash costs and successfully reinvigorate Dana's improving, but still somewhat moribund, operating performance.

9.     Beginning in April 2004, Dana's management repeatedly claimed that the Company was posting "growth in [] gross margins" due to "the continued realization of benefits from our restructuring and other cost-reduction efforts."  Quarter after quarter during FY04, management emphasized the effectiveness of Dana's cost cutting programs and lean manufacturing processes, claiming that these programs were helping the Company profitably weather the increasing raw material prices imposed upon Dana by its vendors.

10.    It was critical that Dana appear as if it had successfully stabilized its operations via cost reductions and earnings growth.  To that end, Burns and Robert C. Richter ("Richter"), Dana's CFO, established benchmark profit margins of 6% for Dana's plants and divisions.  Because Dana had failed to meet the earnings projections it had announced to the market in the previous two fiscal

---

[2]     Fitch, Inc. ("Fitch") is a global rating agency, which provides opinions on the creditworthiness of issuers of debt investments.  Fitch gathers and analyzes financial, industry, market and economic information and publishes assessments of creditworthiness of securities and issuers, providing investors with the means to judge the credit quality and overall financial condition of public companies such as Dana.  A positive rating from Fitch or other rating agencies typically has a positive impact on the trading price of a company's securities.

- 3 -

years, Richter and Burns exerted substantial pressure on defendants to meet these benchmarks and thereby ensure their continued employment and success at Dana. In fact, this pressure was so severe that actual forecasts provided by plant personnel were not accepted by Dana's finance department personnel if they did not meet the pre-established benchmark. In fact, plant personnel were directed to increase forecasts to meet the company-wide pronouncement even where feedback from Dana's customers confirmed that the level of growth would not be achieved. Thus, the increased forecasts were not based on the plant's actual performance, but instead were determined from above before a plant's budget would be accepted and approved by finance department personnel.

**Defendants' Class Period Violations of the Federal Securities Laws**

11.     The pressure to meet Burns and Richter's profitability benchmarks was particularly intense within the Heavy Vehicle Group, and in CVS in particular. Defendants responded to this pressure by utilizing accounting manipulations at the Heavy Vehicle Group and its CVS division to artificially inflate reported earnings for 2004 and 2005. The fraudulently inflated earnings were incorporated into Dana's financial statements for FY04 and the first two quarters of FY05.

12.     Defendants knew, or recklessly disregarded, that Dana's financial statements were false, as defendants were improperly recognizing sales transactions, creating fictitious invoices, failing to properly record steel surcharges, improperly recognizing revenue on price increases not agreed to by Dana's customers and utilizing sham transactions to eliminate debt Dana owed to suppliers.

**The Truth Begins to Reach the Market**

13.     On September 15, 2005, just two months after Dana reported that it had generated a tremendous 275% quarter to quarter earnings increase, Dana announced that it was slashing FY05 EPS guidance in half because of increased steel costs and the Company's inability to adequately cut costs and that it was "likely" to restate its results for 2Q05. On this news, Dana's shares fell over

- 4 -

20%, on substantial trading volume of nearly 8 million shares and continued to spiral downward in the following days as the market fully absorbed this information.

14.     Shocked by this sudden and inexplicable change of circumstances, securities analysts slashed their ratings and FY05 EPS estimates and explicitly questioned management's credibility given that just weeks earlier Dana had reported dramatic earnings growth and portrayed the Company as having successfully overcome the impact of rising raw material costs.

15.     Three weeks later, on October 10, 2005, Dana stunned investors, announcing that it was retracting its FY05 EPS guidance, eliminating Dana's deferred tax assets and restating the Company's financial statements for FY04 as well as the first two quarters of 2005 due to "material weaknesses in [Dana's] internal controls over financial reporting."

16.     On this news, Dana's stock plummeted again, falling by 35% on record heavy trading volume of almost 9 million shares, with the Company's debt securities likewise declining by approximately 10% in reaction to this adverse news.  Securities analysts again slashed their estimates and ratings and expressed outrage at management's refusal to provide any further information concerning these dramatic revelations.

**The Aftermath of Defendants' Fraud**

17.     During late 2005, the Company's credit rating was lowered twice in response to Dana's announcements, relegating the Company's credit rating to junk status.  Dana was also forced to restate its FY04, 1Q05 and 2Q05 financial statements, filing an Amended Report on Form 10-K for FY04 with the SEC on December 30, 2005.  The Company's restatement eliminated $44 million of Dana's reported earnings before interest and taxes ("EBIT") and confirmed that Dana's previously reported EBIT had been overstated by as much as 133%.  On March 3, 2006, Dana filed for bankruptcy.

**SEC Investigation of Securities Fraud at Dana**

18.     Prior to filing for bankruptcy, the Company announced that the SEC had opened a formal investigation into Dana's accounting practices.  More than three years later, on September 11, 2009, the SEC announced that Dana had agreed to the entry of a cease and desist order resolving the SEC's investigation.  On September 11, 2009, the SEC also filed a civil action and entered into a consent judgment with each of the defendants named herein for violations of the federal securities laws associated with their falsification of Dana's reported financial results.  Defendants agreed to settle these claims with the SEC, paying a total of almost $400,000 in disgorgement, pre-judgment interest and civil penalties.  Hodge and Cole were also barred for five years from serving as officers or directors of a public company.

**Plaintiff and the Class Suffered Substantial Harm**

19.     Plaintiff and the Class have suffered hundreds of millions of dollars of damages in connection with defendants' wrongdoing, as they purchased Dana securities at artificially inflated prices, and the price of those securities declined as the impact of defendants' wrongdoing was revealed to the market.

## JURISDICTION AND VENUE

20.     The claims asserted herein arise under §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act" or the "1934 Act") [15 U.S.C. §78j(b)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

21.     This Court has jurisdiction over the subject matter of this action pursuant to 27 U.S.C. §1331 and §27 of the Exchange Act [15 U.S.C. §78aa].

22.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Dana maintained its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

- 6 -

23.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## RELEVANT PARTIES

**Plaintiff**

24.    Plaintiff Hawaii Ironworkers Annuity Trust Fund (the "Trust Fund") is operated for the benefit of its participants and their families.  The Trust Fund purchased Dana's publicly traded securities during the Class Period and was damaged thereby as set forth in the Certification attached hereto.

**Dana Corp.**

25.    Non-party Dana is a supplier of systems and components for global light, commercial and off-highway vehicle manufacturers around the world.  The Company's products are used in cars and vans, Sport Utility Vehicles ("SUVs"), trucks, recreational vehicles ("RVs") and a variety of off-highway vehicles.  Dana operates through two main business units: (1) the Automotive Systems Group ("ASG"), which manufactures drive train systems and engine power products for the automotive, light vehicle, commercial vehicle and outdoor power equipment markets; and (2) the Heavy Vehicle Group, which manufactures and sells axles, drive shafts and other components for the commercial and off-highway vehicle markets.

**Defendants**

26.    Defendant Bernard N. Cole was President of the Heavy Vehicle Group during the Class Period.  As part of his duties, Cole directed the Heavy Vehicle Group's business, dealt with the Company's largest customers, knew about the actual revenue and costs being experienced in its divisions, including CVS, and approved in principle accounting treatments utilized by defendants to falsify Dana's reported financial results.  During the Class Period, Cole participated in the issuance

- 7 -

of and caused to be disseminated false and misleading statements and/or failed to disclose material facts about Dana's accounting practices as detailed in ¶¶35-77.  Cole had been an employee of Dana for 37 years.  He left the Company in December 2005.  As part of his settlement of the SEC action, Cole paid a civil penalty of $65,000.

27.     Defendant Douglas W. Hodge was Vice President and Controller of the Heavy Vehicle Group during the Class Period and reported directly to Cole.  As part of his duties, Hodge directed the Heavy Vehicle Group's business, dealt with the Company's largest customers, knew about the actual revenue and costs being experienced by Dana and the Heavy Vehicle Group and approved in principle accounting treatments utilized by defendants to falsify Dana's reported financial results.  During the Class Period, Hodge participated in the issuance of and caused to be disseminated false and misleading statements and/or failed to disclose material facts about Dana's accounting practices as detailed in ¶¶35-77.  Hodge had been an employee of Dana for 28 years.  He left the Company in December 2005.  As part of his settlement of the SEC action, Hodge paid civil penalties, interest and disgorgement payments totaling $157,000.

28.     Defendant William E. Hennessy was Vice President of North and South America for the Heavy Vehicle Group and General Manager of CVS during the Class Period.  As part of his duties, Hennessy directed the Group's business, dealt with the Company's largest customers, knew about the actual revenue and costs being experienced by the Heavy Vehicle Group and CVS and approved in principle accounting treatments utilized by defendants to falsify Dana's reported financial results.  During the Class Period, Hennessy participated in the issuance of and caused to be disseminated false and misleading statements and/or failed to disclose material facts about Dana's accounting practices as detailed in ¶¶35-77.  Prior to being terminated in August 2005, Hennessy had been an employee of Dana for 28 years, holding the positions of Director of Global Manufacturing and Vice President of Global Manufacturing at the Heavy Vehicle Group.  As part of his settlement

- 8 -

of the SEC action, Hennessey paid civil penalties, interest and disgorgement payments totaling $103,000.

29.    Defendant Robert E. Steimle was CVS's Controller during the Class Period and reported directly to Hennessy. As part of his duties, Steimle knew about the actual revenue and costs being experienced by CVS and approved in principle accounting treatments utilized by defendants to falsify Dana's reported financial results. During the Class Period, Steimle participated in the issuance of and caused to be disseminated false and misleading statements and/or failed to disclose material facts about Dana's accounting practices as detailed in ¶¶35-77. Prior to being terminated in August 2005, Steimle had been an employee of Dana for 28 years. As part of his settlement of the SEC action, Steimle paid civil penalties, interest and disgorgement payments totaling $73,000.

30.    Cole, Hennessy, Hodge and Steimle were obligated to refrain from falsifying Dana's books, records and accounts and were prohibited from using the instrumentalities of interstate commerce or the mails to (a) employ devices, schemes or artifices to defraud; (b) make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made not misleading; or (c) engage in any act, practice or cause of conduct that operates as a fraud. Defendants' conduct violated the Exchange Act and SEC regulations promulgated thereunder in connection with the purchase or sale of Dana securities.

31.    Each of the defendants is liable as a participant in a fraudulent scheme and course of business whose primary purpose and effect was to operate as a fraud and deceit on purchasers of Dana securities by disseminating materially false and misleading statements and/or concealing material adverse facts about Dana's operations. Defendants' scheme deceived the investing public regarding Dana's operations, finances and financial statements and the intrinsic value of the Company's securities and caused plaintiff and other members of the Class to be damaged as a result of their purchases of Dana securities at artificially inflated prices.

- 9 -

32.     During the Class Period, defendants misled the investing public by causing the Company to publicly issue false and misleading statements and/or omit material facts necessary to keep Dana's statements, as set forth herein, from being materially false and misleading, which had the effect of artificially inflating the price of Dana's securities.

33.     Dana's FY04, 1Q05 and 2Q05 financial results were included in public press releases and filings made with the SEC on Forms 10-K and 10-Q.  Dana's Forms 10-K and 10-Q filed with the SEC each represented that the Company's financial statements were fairly stated in conformity with Generally Accepted Accounting Principles ("GAAP"), which consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time.

34.     As Dana has now admitted, the Company's FY04, 1Q05 and 2Q05 financial results were materially false and misleading as the Company's financial reporting violated GAAP and SEC rules in numerous respects.  Regulation S-X [17 C.F.R. §210.4-01(a)(1)], to which the Company is subject as a registrant under the Exchange Act, provides that financial statements filed with the SEC not prepared in conformity with GAAP are presumed to be misleading and inaccurate.

## DEFENDANTS' FINANCIAL MANIPULATION OF DANA'S REPORTED RESULTS

35.     Throughout the Class Period, defendants orchestrated financial manipulations that were designed to, and did, artificially inflate the financial results of the Heavy Vehicle Group and its CVS division as well as Dana itself.

36.     The deceptive accounting manipulations perpetrated by defendants included: (a) recognizing sales "transactions" without a prerequisite transfer of assets and/or risk of loss; (b) recording sham transactions whereby debts owed to Dana's suppliers were eliminated without contractual basis or support and over the objections of its suppliers; (c) issuing fictitious invoices called "debit memos" which had no contractual basis; (d) recognizing revenue on price increases that

- 10 -

were never agreed to and, in some cases, were affirmatively disputed by the Company's customers; and (5) failing to record bona-fide steel surcharges incurred by the Company.

37.     Defendants engaged in conduct which they knew or recklessly disregarded violated applicable law, GAAP and/or Dana's internal accounting rules.  For example:

(a)     As part of defendants' fraudulent accounting practices, Hennessy instructed plant managers and controllers to record improper accounting entries, including mandating that such improper transactions be recorded even after CVS's books had been closed for FY04, 1Q05 and 2Q05 so that CVS could report a profit during those periods.  Hennessy manipulated CVS's financials to report a bogus profit in a predetermined amount after CVS employees reported that no additional income could lawfully be included in its financial statements.

(b)     Operating under the auspices of CFO Richter, Hennessy instructed plant managers and controllers during the Class Period to record improper accounting entries after the end of fourth quarter 2004 ("4Q04"), 1Q05 and 2Q05 in order to meet the unobtainable 6% profit margin benchmark established by Dana's senior management.  Burns and Richter knew the 6% benchmark was unobtainable when the edict was issued because steel prices had increased dramatically and that by requiring this arbitrary number, Hennessy would have to manipulate the underlying data to generate reported profits.

(c)     Hennessy and Hodge repeatedly directed Steimle to improperly record income or defer expenses even though Steimle expressed concerns about the propriety of such actions. Nonetheless, Steimle directed his accounting staff to make the improper accounting entries even though he was aware that doing so would violate both GAAP and Dana's internal accounting policies and would cause Dana's report financial statements to be false and misleading.  Likewise, Cole knew that CVS had recorded income from certain proposed product price increases before such increases had been agreed to by customers.

- 11 -

38.     The defendants' fraudulent accounting manipulations resulted in a material overstatement of Dana's reported results, causing Dana to overstate its earnings before interest and taxes, or EBIT, in the aggregate by $31.6 million, or 26.5%.[3]

| (All dollar amounts in millions) | Yr. Ended 2004 | Qtr. Ended 3/31/05 | Qtr. Ended 6/30/05 | Total |
|---|---|---|---|---|
| Dana Restated EBIT | $33.0 | $24.0 | $62.0 | $119.0 |
| **EBIT Overstatement Due to Defendants' Accounting Fraud** | **$10.7** | **$9.1** | **$11.8** | **$31.6** |
| Overstatement as % of Dana's Restated EBIT | 32.4% | 37.8% | 19% | 26.5% |

39.     Defendants were aware that these accounting practices did not comply with GAAP and each was responsible for the fair presentation of the financial statements of their business unit or division, and each signed the required year-end and quarterly representations, which Dana established pursuant to the requirements of the Sarbanes-Oxley Act of 2002, falsely stating that the financial results of CVS were fairly presented, accurate and prepared in conformity with GAAP.  In fact, with respect to CVS's annual reporting, defendants specifically attested that they had "reviewed the criteria for revenue recognition," including "collectability, delivery, evidence of arrangement and fixed prices," and that CVS was recognizing revenue in conformity with GAAP when they knew or recklessly disregarded that their attestations were materially false and misleading when made.

40.     Dana's 2004 Form 10-K set forth the Company's revenue recognition policy as follows: "Sales are recognized when products are shipped and risk of loss has transferred to the customer."  Dana's above-stated revenue recognition policy was required by, and reflects the principles set forth in, GAAP, providing that revenue should not be recognized until it is realized or

---

[3]     According to Dana's SEC filings, EBIT is a key financial metric used by management to evaluate Dana's operating segments.

realizable and earned. FASB's Statement of Financial Accounting Concepts ("Concepts Statement") No. 5: *Recognition and Measurement in Financial Statements of Business Enterprises*, ¶83. Pursuant to GAAP, the conditions for revenue recognition generally are met when persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered, the seller's price is fixed or determinable, collectability of the sales price is reasonably assured and the entity has substantially performed the obligations which entitle it to the benefits represented by the revenue. Generally, revenue should not be recognized until an exchange has occurred and the earnings process is complete. A transfer of risk has to occur in order to effect an "exchange" for the purposes of revenue recognition. *See, e.g.,* SEC Staff Accounting Bulletin ("SAB") Nos. 101 and 104[4]; FASB Concepts Statement Nos. 2 and 5; FASB Statement of Financial Accounting Standards ("SFAS") No. 48; Accounting Research Bulletin ("ARB") No. 43; Accounting Principles Board ("APB") Opinion No. 10; and American Institute of Certified Public Accountants ("AICPA") Statement of Position ("SOP") 97-2.

**Defendants' Fraudulent Recognition of Sales**
**"Transactions" Without a Transfer of Assets and/or Risk of Loss**

41.     During 2004, Hennessy devised arrangements, referred to within CVS as "one-off" deals, with Sypris Solutions ("Sypris"), an automotive parts supplier located in Kentucky. As noted above, GAAP requires the delivery of product and the substantial performance of the obligations which entitle the entity to the benefits represented by the revenue. During the Class Period,

---

[4]     In December 2003, SAB No. 101 was superseded by SAB No. 104, which updated portions of SAB No. 101 to make it consistent with then current authoritative accounting guidance. The principal revisions to SAB No. 101 included the deletion of certain interpretive guidance because of the issuance of private sector U.S. GAAP, and the incorporation of certain sections of the staff's "Revenue Recognition in Financial Statements Frequently Asked Questions and Answers" into SAB No. 101.

however, defendants caused CVS to violate these most basic revenue recognition standards. During 2004, Hennessy signed agreements to "sell" parts as well as forming and seam welding equipment to Sypris in exchange for payments totaling more than $3.3 million. Pursuant to the agreements, Dana received $2.8 million and $500,000 from Sypris during 3Q04 and 4Q04, respectively, and would make some future delivery of equipment. The signed agreements specified that if Dana failed to sell or deliver the equipment to Sypris, Dana was obligated to return the upfront $3.3 million in payments it received from Sypris. Notwithstanding these terms and Dana's publicly disclosed revenue recognition policy providing that "[s]ales are recognized when products are shipped and risk of loss has transferred to the customer," Hennessy, Hodge and Steimle each agreed to treat the $3.3 million in upfront payments received from Sypris as FY04 income *even though the equipment that was "sold" was then being used by Dana to manufacture its own products*. Likewise, defendants caused CVS to record additional revenue in FY04 from parts "sold" to Sypris for use in equipment that Sypris did not yet own. The agreement specifically provided that the *parts would remain in Dana's possession at its facilities* and that Dana would insure and assume any loss associated with the parts until they were transferred to Sypris. Additionally, the agreement required Dana to "repurchase" some or all of the spare parts "sold" to Sypris. Hennessy, Hodge and Steimle entered into these arrangements so that CVS could falsely inflate its reported results in order to achieve the perception of growth. Recording these sham round-trip transaction as a "sale" violated GAAP's revenue recognition criteria and Dana's revenue recognition policies. These transactions were a material factor in Dana reporting FY04 EBIT that was overstated by approximately 32%.

42.     Hennessey negotiated the sale and partial leaseback of Dana's plant located in Toluca, Mexico with Sypris in 2Q04. The contract documents were signed in June and August 2004. CVS received a $5 million premium in connection with this transaction. Under GAAP, any profits from the sale/leaseback portion of the transaction should have been deferred and amortized over the life of

- 14 -

the agreement. However, Hennessy, Hodge and Steimle all agreed that CVS would book the entire $5 million from this supplier as income in the second quarter. Consequently, Dana overstated its 2Q04 and FY04 EBIT by approximately $2.8 million.

**Defendants' Fraudulent Recognition of
Revenue on Unagreed upon Price Increases**

43.     As noted above, GAAP requires the persuasive evidence of an existing sale agreement and a reasonable assurance of its collectability before revenue can be recognized. However, during 1Q05, Hennessy and Steimle (with the knowledge of Hodge and Cole), fraudulently inflated CVS's earnings by recognizing revenue associated with unilateral price increases on truck axles sold to two of Dana's most significant customers, even though Dana was still in the process of negotiating price increases with these customers and no written agreement for such price increases had been finalized. *In fact, Hennessy and Steimle caused Dana to recognize revenue on the phantom price increases even though the customers were never invoiced for such increases. Accordingly, Dana had no expectation of collecting the purported price increases because defendants feared alienating Dana's major customers by billing them for increases that had not been agreed to*. These practices materially contributed to defendants fraudulently overstating Dana's 1Q05 and 2Q05 EBIT by $2 million and $8.6 million, respectively.

**Customer One**

44.     In July 2000, Dana entered into a long-term supply agreement that provided for annual price adjustments associated with raw material price changes. Beginning in the fall of 2004, Cole requested that one of Dana's customers ("Customer One") move the scheduled July 2005 price adjustment date to February 2005. No written agreement associated with this request was sought by Dana or finalized by Customer One. In addition, no invoices or amended price lists associated with the requested price increases were sent to Customer One. However, Cole, Steimle, Hennessy and Hodge were aware that CVS recognized revenue for the requested price increases between March

- 15 -

2005 and July 2005, even though they knew that the terms associated with any such increases had not yet been agreed to by the parties and Customer One had not been invoiced. For example, during 2Q05, Cole received emails and other correspondence indicating that Dana and Customer One were in the process of negotiating the requested price increases sought by Dana, but Steimle advised Hennessy and Hodge that no written agreement for any such price increases had yet been executed. In fact, while Steimle expressly discussed the impropriety of so doing, he and Hennessy directed plant controllers to record revenue on these unilateral price increases. As a result of the foregoing, Dana's EBIT was overstated by $1.4 million in 1Q05 and $7.3 million in 2Q05.

**Customer Two**

45.     Dana entered into contracts with another customer ("Customer Two") that granted Dana the right to increase the prices for parts sold based on various steel indices. The contracts required the parties to come to an agreement on which steel indices to use as a basis for any price increases. However, in 2004, CVS began to recognize and accrue revenue for price increases before resolving the required condition with Customer Two. Although Dana was attempting to negotiate a retroactive price increase with Customer Two during the first two quarters of 2005, Hennessy and Hodge received written notice that the parties had not reached an agreement regarding the percentage increase, but Hennessey and Hodge nonetheless directed Steimle to record income for these retroactive price increases. Notably, CVS did not even send Customer Two an invoice (as was its practice) for the price increases on which it had already recorded revenue. As a result of the foregoing, Hennessy and Hodge caused Dana's 1Q05 and 2Q05 EBIT to be overstated by $606,000 and $1.3 million, respectively.

**Defendants' Use of False Debit
Memos to Inflate Earnings**

46.     During the Class Period, Hennessy and Steimle, with the knowledge of Hodge and Cole, caused CVS to artificially inflate its earnings by issuing invoices called "debit memos" to

suppliers.  These debit memos had no contractual basis, and unilaterally required suppliers to reduce outstanding amounts payable.  As described below, these practices caused Dana to overstate its EBIT by $3.9 million between 4Q04 and 2Q05.

**Supplier "Loan"**

47.     During 4Q04, Steimle directed CVS personnel to send $750,000 in debit memos to an Ohio supplier (the "Ohio Supplier") and reduce CVS's expenses accordingly.  The first memo, in the amount of $500,000, was sent by CVS on December 20, 2004.  The debit memo was predicated on CVS's claim that the Ohio Supplier breached a scheduled October 2004 parts production start date, which purportedly forced CVS to buy the parts from another vender at a higher price.  However, *the supply agreement executed between Dana and the Ohio Supplier did not even commence until November 1, 2004*.  The second memo, totaling $250,000, which CVS sent to the Ohio Supplier on January 6, 2005, was also contrived and lacked a contractual basis.  Accordingly, the Ohio Supplier disputed the claim, stating that it had no obligation to reduce CVS's outstanding payable.  Thereafter, the Ohio Supplier accommodated CVS by accepting the two memos when Steimle agreed that CVS would repay the supplier $750,000 in five monthly installments beginning in March 2005.  These transactions, which in substance were loans received from the Ohio Supplier, were recorded as a reduction in CVS's expenses for no purpose other than to inflate CVS's reported results.  Accordingly, Steimle caused Dana to understate its expenses by $500,000 in 4Q04 and $250,000 by 1Q05.

**Additional Disputed Debit Memos with Sypris Solutions**

48.     Hennessey and Steimle caused CVS to issue a total of $3.3 million of additional debit memos to Sypris, including:

(a)     At the end of December 2004, Steimle authorized a $320,000 debit memo purportedly associated with severance payments that CVS paid on behalf of Sypris after it purchased

- 17 -

one of Dana's plants.  Hennessy, Hodge and Steimle were aware that this claim was disputed, and CVS later conceded that Sypris did not in fact owe CVS the amount at issue.

(b)      In December 2004 and January 2005, CVS issued additional debit memos to Sypris totaling $701,000, which were purportedly associated with overtime and fringe benefit costs for untimely deliveries and delivery shortages.  Hennessy and Steimle both were aware that Sypris disputed these claims and that the contract between Dana and Sypris did ***not*** provide for Dana to recover such costs.

(c)      On December 31, 2004, Hennessy and Steimle caused CVS to issue a debit memo to Sypris in the amount of $1.6 million for purported overcharges on axle shafts, ***notwithstanding the fact the contract between Dana and Sypris expressly required Dana to pay that price for these axle shafts***.  On April 12, 2005, CVS cancelled the $1.6 million debit and paid that amount to Sypris.  Approximately two weeks later, Hennessy and Steimle caused CVS to record a $2.3 million deferred receivable from Sypris.  The receivable included the original $1.6 million axle shaft claim from December 2004, and two additional claims related to an axle shaft overcharge of $390,000 for 1Q05 and $310,000 for 2Q05.

(d)      As a result of the foregoing, Dana's FY04 expenses were understated by $2.7 million, or an amount equal to approximately 8% of its FY04 EBIT, and its 1Q05 expenses were understated by $930,000, or approximately 4% of its 1Q05 EBIT.

**Defendants' Fraudulent Deferral
of Steel Surcharges**

49.      The dramatic rise in the price of steel during the Class Period put significant pressure on Dana's ability to meet its earnings targets.  Although Dana's suppliers could pass steel surcharges along to CVS, Dana's agreements with its customers provided that the Company could only seek price increases once each year.  This limitation, juxtaposed with the mandates imposed by Richter and Burns, compelled Hennessy, Hodge and Steimle to engage in deceptive practices to mask the

- 18 -

true financial impact that rising steel prices had on the Company's earnings during the Class Period. In fact, Hennessy, Steimle and Hodge regularly and unlawfully directed CVS to delay recording expenses associated with valid steel surcharges.

50.     Dana's steel suppliers typically passed along increased costs of steel to the Company in separate invoices in the form of raw material surcharges.  During the Class Period, Hennessy and Steimle caused CVS to fail to timely record such surcharges by: (a) instructing the Company's purchasing department to request that Dana's steel suppliers delay the issuance of surcharge invoices; (b) rejecting valid steel surcharge invoices outright, despite lacking a legal basis to do so, in order to deliver the expense to a later period; and (c) recording only the "base" cost of steel while delaying the recognition of the steel surcharge for up to three to four months.

51.     CVS received invoices from Sypris for steel surcharges totaling approximately $2.6 million dated between April 30, 2004 and February 2, 2005.  When Steimle was informed about the receipt of these invoices, he directed that they not be recorded by instructing the purchasing department to return them to the supplier, as Steimle knew or recklessly disregarded that the purchasing department had requested that Sypris falsify the dates on the surcharge invoices.  Sypris refused the Company's request and sent Hennessy correspondence informing him that CVS had not paid the surcharge invoices.  CVS ultimately agreed to pay the surcharge invoices in March 2005.

52.     Beginning in late 2004 and continuing through 2005, Hodge and Hennessy instructed Steimle to record the base cost of steel as an expense at the time that the steel was received, but to delay recognition of the steel surcharge costs for three to four months.  Although Steimle initially refused to engage in this fraudulent accounting practice, he capitulated and followed Hodge and Hennessy's mandate.  Thereafter, Hennessy and Steimle prepared a January 2005 monthly report, which stated that CVS had "delayed [recording] over $3.1 [million of profit after tax] of steel and other material variances" from 4Q04 to 1Q05.

53.     Defendants knew or recklessly disregarded that these practices violated GAAP because the Company's expenses as reported in Dana's FY04, 1Q05 and 2Q05 financial statements were not recorded as they actually were incurred.  As a result of these practices, Dana's 1Q05 expenses were understated by $2.8 million, or an amount equal to approximately 8% of EBIT, and its 2Q05 expenses were understated by $4 million, or an amount equal to approximately 6% of 2Q05 EBIT.

**Defendants' Other Fraudulent
Accounting Practices**

54.     During the Class Period, Steimle directed a series of additional fraudulent accounting practices, either on his own initiative or as instructed by Hennessy or Hodge, which practices occurred after CVS had already closed its books and materially inflated Dana's reported financial results for the relevant period.

55.     Prior to the beginning of the Class Period, Steimle participated in negotiations to restructure an existing supply agreement with Bharat Forge Ltd. ("Bharat"), a forging supplier located in India.  The intent of the restructuring was to create a means by which CVS could accelerate, albeit improperly, its revenue recognition and reported profit.  The negotiations involved a proposal whereby Bharat would pay Dana $2.5 million if Dana agreed to forego future price reductions it was entitled to receive under the existing agreement.  No agreement with Bharat, either to restructure the original supply agreement or to obligate the supplier to pay Dana $2.5 million, was ever executed.  In mid-February 2005, Hennessy sent an email to Bharat seeking $1 million pursuant to the above noted negotiations so that CVS could meet its 1Q05 profit expectations.  Steimle then directed employees to send two invoices to Bharat on the last day of February 2005.  Hennessy, Hodge and Steimle fraudulently decided to record these invoices as revenue, causing Dana to overstate its revenue and income for 1Q05 by approximately $1 million, or approximately 3% of EBIT.

- 20 -

56.     At the end of 1Q05, Steimle directed a plant controller to record $300,000 in income based on a letter of intent ("LOI") for a proposed sale of equipment with a tool and die company. When the plant controller challenged Steimle's directive, he falsely told the controller that the LOI had been reviewed and approved by "audit."  Steimle also told the plant controller that it was important to book this income in order to meet profit goals.  Because the LOI with the tool and die company was not persuasive evidence of a sales agreement and the equipment was not delivered during 1Q05, Steimle caused Dana to report income for 1Q05 which was overstated by $300,000, or approximately 1% of EBIT.

57.     Steimle directed a CVS accounting manager to record an entry of approximately $1.1 million without any basis or documentation after CVS closed its books for 1Q05. Steimle told the accounting manager that he and Hennessy had received "commitments" that validated the recording of a $1.1 million entry as income.  Because CVS's books for the quarter had already been closed, the accounting manager requested that Dana's corporate accounting department post a corresponding journal entry.  Without reviewing any documentation for this accounting entry, Hodge authorized an accounting employee to forward the request and inform Dana's corporate accounting department that he had approved the entries.  As a result of this entry, Dana's income was overstated by $1.1 million for 1Q05, or approximately 3% of EBIT.

58.     Near the end of April 2005, Hennessy and Steimle directed the CVS plant controller to record $661,000 in revenue after the CVS plant controller reported that a plant sustained $661,000 in losses.  Hennessy and Steimle stated that this entry, which eliminated the plant's losses during the period, be recorded because the losses reported by the plant were the result of incorrect pricing.  In July 2005, the plant controller reversed the entry after confirming that the plant's losses were not the result of incorrect pricing, but, rather, were the result of higher material costs.  As a result of the foregoing, Dana's 2Q05 income was overstated by $661,000, or approximately 1% of EBIT.

- 21 -

59.     Also in April 2005, Hennessy and Steimle told the same plant controller that CVS expected to return certain bearings it had purchased in February and March 2005 and instructed the plant controller to record $606,000 as income.  Hennessy and Steimle knew that the bearings had not yet been returned when the income was recognized.  In fact, the bearings were never returned to the suppliers, and in July 2005 the plant controller reversed this entry.  Consequently, Dana's 2Q05 revenue was overstated by $606,000, or approximately 1% of EBIT.

60.     When Steimle discovered an earnings shortfall of roughly $200,000 at the end of 2Q05, he asked a CVS accounting manager twice (on the same day) whether there were any additional entries that could be made to improve CVS's financial performance for the quarter.  Later that day (after the accounting manager concluded no additional entries could be made), Steimle directed the accounting manager to make an entry to reduce material costs by $362,000, purportedly to correct negative inventory.  Although Steimle never provided the CVS accounting manager with any documentation to support the entry, Hodge, without review, authorized his assistant to forward the entry to Dana's corporate accounting department with his approval.  As a result of the foregoing, Dana's 2Q05 EBIT was overstated by $362,000.

61.     During 1Q05 and 2Q05, Hennessy and Steimle also fraudulently caused Dana to recognize income based solely on LOIs to sell spare parts to a machine tool supplier and an equipment finance company.

62.     On February 28, 2005, CVS signed an LOI with the machine tool supplier, which provided, among other things, that the supplier purchase a total of $800,000 in spare parts from two CVS plants.  Although no contract was ever executed, CVS booked $800,000 in income during 1Q05.  The transaction was reversed during 2Q05.  As a result, Dana's income for 1Q05 was overstated by $800,000, or approximately 3% of EBIT.

- 22 -

63.     In April 2005, Hennessy directed Steimle and others to negotiate a sale of spare parts to an equipment finance company.  CVS recognized income on the transactions with the equipment finance company based solely on LOIs, without an executed sales agreement.  Moreover, since the agreement with the equipment finance company required Dana to repurchase the spare parts at a premium and the risk of loss on the parts remained with Dana, the transaction was in substance a financing arrangement disguised as a sale, and consequently no income could be recognized under GAAP.

64.     In April and May 2005, CVS and the equipment finance company entered into five LOIs for the sale of spare parts, each of which contained the following provisions: (a) Dana was required to repurchase the spare parts it needed exclusively from the finance company for a set time period at a premium that ranged from 5% in the first year to 30% in the final year; (b) Dana would continue to insure the spare parts; (c) the risk of loss remained with Dana; and (d) the parts were to be maintained at Dana's facilities.  Notwithstanding these provisions, Hennessy and Hodge instructed Steimle to improperly recognize $9.8 million on these transactions in April and May 2005, which they knew or recklessly disregarded, violated GAAP's revenue recognition criteria.

65.     On December 30, 2005, Dana filed a Form 10-K/A that restated its SEC filings for FY04 and Forms 10-Q/A for the first two quarters of 2005, which restatement included a correction of the fraudulent entries discussed above.  As shown below, based upon defendants' fraudulent practices and other accounting errors, Dana originally reported EBIT of $77 million for FY04 and $130 million for the first two quarters of 2005, which amounts were overstated by between 19% and 38% due to defendants' fraud.

| (All dollar amounts in millions) | Yr. Ended 2004 | Qtr. Ended 3/31/05 | Qtr. Ended 6/30/05 | Aggregate |
|---|---|---|---|---|
| Dana *Reported* EBIT | 77.0 | 38.0 | 92.0 | 207.0 |
| Dana *Actual* EBIT | 33.0 | 24.0 | 62.0 | 119.0 |
| **EBIT Overstatement Due to Defendants' Accounting Fraud** | **$10.7** | **$9.1** | **$11.8** | **$31.6** |
| Total EBIT Overstatement | 44.0 | 14.0 | 30.0 | 88.0 |
| **Overstatement due to Defendants' Accounting Fraud as % of Actual EBIT** | **32.4%** | **37.8%** | **19%** | **26.5%** |

66.     The reduction of earnings in the restatement included a $31.6 million reduction in EBIT from fraudulent accounting practices or approximately 26.5% of Dana's actual EBIT for FY04, 1Q05 and 2Q05.  As a result of defendants' fraud and other accounting errors, Dana's reported EBIT for this period was overstated by a total of $88 million, or 73.9%.

## FALSE AND MISLEADING STATEMENTS AND OMISSIONS

67.     On February 23, 2005, Dana issued a release reporting the Company's 4Q04 and FY04 financial results, including $61 million of 4Q04 EBIT for its Heavy Vehicle Group, which results included the financial results for its CVS division.  For FY04, the Heavy Vehicle Group reported EBIT of $173 million, while Dana itself posted aggregate FY04 EBIT of $77 million.

68.     On March 9, 2005, Dana filed with the SEC its FY04 Annual Report on Form 10-K which again repeated the false FY04 results for Dana and its Heavy Vehicle Group as detailed above.

69.     The February 23, 2005 press release and FY04 Form 10-K filing were false and misleading when made and failed to disclose material facts concerning Dana's financial results, business and business practices.  The true facts, which were known to or recklessly disregarded by defendants included those detailed in ¶¶35-77.  As a result of defendants' manipulations, the financial results reported by the Heavy Vehicle Group, its CVS division and Dana itself were

- 24 -

materially overstated. Defendants made sure that these manipulated results were incorporated into Dana's public filings to be reported to Dana's investors as part of the Company's quarterly and year end reporting requirements, and would be relied upon by investors and the market in their valuation of Dana's stock. Defendants' actions caused Dana's reported FY04 EBIT to be overstated by 32.4%.

70.     On March 23, 2005, Dana announced a 40%-50% reduction in the Company's 1Q05 EPS outlook to $0.11-$0.13 and a decrease in FY05 EPS to $1.30-$1.45 due to higher than expected steel costs as well as some component shortages and lower than expected light-vehicle production rates. Dana's management noted that "we will see a substantial improvement in the second quarter," while failing to disclose the truth about defendants' manipulation of Dana's financial results, as detailed in ¶¶35-77. In response to this disclosure, the price of Dana securities declined by nearly 5%.

71.     On April 20, 2005, Dana reported 1Q05 results. The release reported 1Q05 EBIT of $40 million for the Heavy Vehicle Group and Dana's 1Q05 EBIT, net income and EPS of $38 million, $18 million and $0.12, respectively.

72.     On April 26, 2005, Dana filed a Registration Statement and Prospectus (collectively, the "Prospectus") in connection with the sale of $450 million of debt securities. The Prospectus incorporated by reference the Company's FY04 Report on Form 10-K and 1Q05 Report on Form 10-Q, each of which was false and misleading due to defendants' actions as detailed in ¶¶35-77.

73.     On May 6, 2005, Dana filed with the SEC its quarterly report on Form 10-Q for 1Q05 which repeated the false 1Q05 results for Dana and its Heavy Vehicle Group as detailed in ¶71 above.

74.     The April 20, 2005 release, 1Q05 Form 10-Q and the Prospectus were each false and misleading when made and/or filed with the SEC and failed to disclose material facts concerning

- 25 -

Dana's financial results, business and business practices. Defendants knew or recklessly disregarded, but failed to disclose, that their actions, as detailed in ¶¶35-77, caused CVS's financial results to be overstated, which results were incorporated into and were a material part of the results reported for Dana and its Heavy Vehicle Group's business unit. Defendants made sure that these manipulated results were reported to Dana's investors as part of the Company's quarterly and year-end reporting requirements required by the SEC, and would be relied upon by investors and the market in their valuation of Dana's stock. Defendants' actions caused Dana's 1Q05 EBIT to be overstated by 37.8%.

75.     On July 20, 2005, Dana issued a release reporting its 2Q05 financial results. The release reported 2Q05 EBIT of $59 million for Heavy Vehicle Group and 2Q05 EBIT for Dana of $92 million. The release noted Dana's 2Q05 net income of $53 million, an increase of almost 300% over 1Q05. Stating that the reported financial results "showed significant improvement over results for the first three months of the year," the release provided:

> - The Heavy Vehicle Technologies and Systems Group continued to benefit from the strong commercial and off-highway markets. Its sales grew by 21 percent in the second quarter compared to the same period last year; [and]
>
> - Heavy vehicle profits were up 19 percent compared to the second quarter of 2004 .
> . . .

76.     On July 29, 2005, Dana filed with the SEC its quarterly report on Form 10-Q for 2Q05 which repeated the Heavy Vehicle Group's and Dana's results as detailed in ¶75 above, which financial performance metrics were manipulated by defendants' accounting malfeasance and other fraudulent actions.

77.     The July 20, 2005 press release and 2Q05 Form 10-Q filing were false and misleading when made and/or filed with the SEC and failed to disclose material facts concerning Dana's financial results, business and business practices. Defendants knew or recklessly disregarded, but failed to disclose, that their actions, as detailed in ¶¶35-77, caused CVS's financial results to be

- 26 -

overstated, which results were incorporated into and were a material part of the results reported for the Heavy Vehicle Group business unit. Defendants made sure that these manipulated results would be reported to Dana's investors as part of the Company's quarterly and year-end reporting requirements required by the SEC, and would be relied upon by investors and the market in their valuation of Dana's stock. Defendants' actions caused Dana's 2Q05 EBIT to be overstated by 19%.

**Defendants' Fraud Begins to Unravel**

78.     On September 15, 2005 – ***barely two months*** after Dana announced a nearly 300% quarter-to-quarter earnings increase and reaffirmed FY05 earnings guidance of $1.30-$1.45 per share – Dana's management further shocked the market by announcing that it was slashing FY05 earnings guidance to no more than $0.70 per share and by revealing that the Company was "likely" to restate its previously reported financial statements. The release stated:

> Dana Corporation today announced that it has revised its 2005 full-year earnings outlook to a range of $90 million to $105 million, or approximately 60 to 70 cents per share, from its previously announced range of $196 million to $219 million, or $1.30 to $1.45 per share. In both cases, the outlook excludes gains and losses on divestitures and asset sales, and other unusual items.

> The company is assessing whether, as the result of the change in earnings outlook, it will be required to write down its U.S. deferred tax assets. A write-down of U.S. deferred tax assets and the consequent inability to record similar tax benefits in the future would not have a cash impact, but would have a direct negative impact on the revised 2005 full-year earnings outlook set forth above. At June 30, the company's U.S. deferred tax assets totaled approximately $740 million. The revised outlook includes approximately $60 million of tax benefits on domestic losses in the second half.

> Dana Chairman and CEO Michael J. Burns said that this reduction reflects a reassessment of the company's full-year outlook after reviewing its preliminary results through the end of August. These results indicate that the company is being negatively impacted by continued higher-than-expected costs for steel and other materials, as well as increased energy costs. In addition, the company's Commercial Vehicle business has been unable to achieve projected cost reductions and is experiencing significant manufacturing inefficiencies. For these reasons, the company expects that the Commercial Vehicle unit's performance in the balance of the year will be substantially below previous projections.

*     *     *

Company Likely to Restate Second-Quarter 2005 Financial Statements

Dana also announced that it will likely restate its second-quarter 2005 financial statements, primarily to correct inappropriate recognition of price increases in its Commercial Vehicle business during the second quarter.

Based on a preliminary internal review, the company believes that the potential restatement could result in an after-tax reduction of approximately $10 million to $15 million in second-quarter income.

79.     In reaction to this news, the price of Dana stock dropped more than 20% on September 15, 2005 alone, on substantial volume of almost 8 million shares, more than eight times the average trading volume.  The Company's stock continued to fall in the days immediately following this announcement, declining another 10% as these adverse facts and their impact leaked into the market.

80.     Surprised by the September 15, 2005 announcement, securities analysts immediately challenged managements' credibility.  For instance, Wachovia securities' analyst Richard M. Kwas issued a report on September 15, 2005, stating: "***Today's news was a significant body blow to a management team that already had credibility issue***."

81.     Fitch responded to the September 15, 2005 announcement by downgrading Dana's debt to BB+ and placing the Company on Rating Watch – Negative.

82.     Only three weeks later, on October 10, 2005, Dana issued a release announcing that its financial statements could "no longer be relied upon" and that the Company would be restating its FY04, 1Q05 and 2Q05 financial statements and writing off its deferred tax assets.  Noting that the restatement would not, as previously indicated, be confined just to its 2Q05 financial statements, the release stated:

Dana's management and the Audit Committee of the Board of Directors have determined, as a result of their ongoing internal investigations, that the company did not properly account for certain items during 2004 and the first and second quarters of 2005.  As a result, management and the Audit Committee have concluded that Dana's financial statements for these periods should no longer be relied upon and that restatements will be required for these periods.  The primary purpose for the

- 28 -

restatements is to correct issues involving customer pricing and transactions with suppliers in Dana's Commercial Vehicle business.

83.    In reaction to the these startling revelations, the price of Dana's shares dropped nearly 35%, or $3.15 per share, on record heavy trading of almost 9 million shares.  Dana's debt securities similarly declined by approximately 10% in reaction to this news.  Securities analysts responded by again slashing their FY05 EPS estimates and expressing their exasperation with Dana's management's steadfast refusal to provide any further information concerning the October 10, 2005 announcement.

### THE AFTERMATH OF DEFENDANTS' FRAUD

84.    On October 18, 2005, Dana's management announced they expected to reduce Dana's previously reported net income by as much as $25-$45 million *after tax*:

> Although the investigation is not yet complete, and the effect of the above restatements may require the restatement of financial statements for prior periods, the company currently expects that the net aggregate reduction in net income for all periods to be restated will be between $25 million and $45 million after tax.

85.    In reaction to the recent announcements about the accounting chicanery at the Company, Fitch downgraded Dana's debt to BB- "based on the company's deteriorating operating results, accounting and financial control issues, and sustained higher debt levels."  On December 30, 2005, Dana issued a release admitting the prior financial statements issued for FY04, 1Q05 and 2Q05 were false when issued.  The release stated:

> Dana Corporation announced today that it has completed the restatements of its financial statements for the first two quarters of 2005, the year 2004, and prior years, and has filed amended annual and quarterly reports for the applicable periods with the U.S. Securities and Exchange Commission.  Specifically, the company has filed a Form 10-K/A for the fiscal year ended Dec. 31, 2004, and Forms 10-Q/A for the quarters ended March 31 and June 30, 2005.

> As a result of these restatements, the total reduction in net income after tax for all periods restated was $44 million.

> ***The primary items in the restatements impacting the reduction in aggregate net income were inappropriate recognition of certain customer pricing increases and***

- 29 -

*supplier reimbursement costs in the company's Commercial Vehicle business*, which prompted internal investigations. As announced on Dec. 23, the reduction was also affected by a correction to the prior calculation of the company's 2004 LIFO inventory reserves with respect to steel surcharges.

*     *     *

"We are pleased to have completed our review and the filing of our restated financials." said Dana Chairman and CEO Michael J. Burns. "During our investigations, *we identified material weaknesses in our system of internal control over financial reporting and we have taken – and will continue to take – appropriate actions to remediate these weaknesses*."

86.     Dana also filed an Amended FY04 Report on Form 10-K that admitted that "*as a result of the material weaknesses discussed below . . ., management, including our CEO and CFO, has concluded that our disclosure controls and procedures were not effective* . . . ."

87.     On January 17, 2006, Dana announced its 3Q05 results, a net loss of *$1.27 billion* or $8.50 per share, stating:

The company provided a valuation allowance, as announced on October 10, 2005, against its net U.S. deferred tax assets during the third quarter. The one-time impact of providing this allowance was a reduction in net income of $918 million in the period, which represents the restated net U.S. deferred tax assets at the beginning of the third quarter and also includes $13 million for a similar allowance against the company's U.K. tax assets. The valuation allowance was recorded because, based on its current outlook, Dana believes it is no longer more likely than not that the company will be able to utilize these tax assets. This action does not affect the company's ability to use these tax assets later if justified by future profitability in the U.S. and U.K.

88.     On February 27, 2006, the Company announced that it was in discussions with banks and financial institutions regarding financing alternatives. Two days later, on February 29, 2006, Dana's management issued a release reporting that Dana had defaulted on $21 million of interest payments on its debt. On March 3, 2006, Dana filed for bankruptcy.

89.     On September 11, 2009, the SEC announced that it had concluded its investigation and Dana had agreed to the entry of a cease and desist order. The same day, the SEC also filed a civil action against each of the defendants and each of them consented to judgment for their

- 30 -

violations of the federal securities laws arising out of their falsification of Dana's reported financial results.

### DISCLOSURE OF DEFENDANTS' INVOLVEMENT IN THE FALSIFICATION OF DANA'S FINANCIAL STATEMENTS

90.     As alleged herein, Dana first disclosed that there were problems with the information in the Company's financial statements on September 15, 2005.  The Company then warned investors not to rely on its previously released financial statements, advising investors that Dana's FY04, 1Q05 and 2Q05 financial statements would need to be restated.  The Company, however, did not provide any information about why the restatements were necessary apart from indicating that Dana needed to "correct issues involving customer pricing and transactions with suppliers in Dana's Commercial Vehicle business."

91.     In October 2005, shareholders brought an action against Dana, its CEO and CFO for violations of the federal securities laws stemming from the Company's September 15 and October 10, 2005 disclosures.  *Frank v. Dana Corp.*, Case No. 3:05-CV-07393 (the "2005 Action").

92.     Thereafter, the Lead Plaintiffs that were appointed by this Court in the 2005 Action continued to investigate their claims.  Because discovery in the 2005 Action was stayed by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Lead Plaintiffs diligently utilized informal means to gather information concerning the fraudulent practices utilized at Dana to inflate the Company's financial statements and the individuals involved in those practices.  The investigation was limited to publicly available information and voluntary informal interviews with potential witnesses that Lead Plaintiffs were able to identify from the information available to them. The PSLRA discovery stay precluded the use of legal authority to compel potential witnesses to provide information and/or documents relevant to the claims asserted in the 2005 Action.

93.     In February 2006, the Company announced that the SEC had opened a formal investigation of Dana's accounting practices that necessitated the restatement of its previously

reported financial statements.  As part of its investigation, the SEC had access to Dana's internal documents and personnel, and had the legal authority to compel the production of relevant information and testimony.  Lead Plaintiffs did not, but continued to diligently investigate based upon publicly available documents.  Plaintiff's investigation and that associated with the 2005 Action did not reveal defendants' identity and participation in the fraudulent activities at issue.  On September 11, 2009, the results of the SEC's investigation into Dana's accounting practices was first made public.  As described in ¶¶35-77, the SEC found substantial information concerning fraudulent accounting practices being employed by the defendants named herein.

94.     Despite a thorough and diligent investigation by Lead Plaintiffs, defendants were not identified as participants in the scheme to inflate Dana's financial results prior to September 11, 2009.  This action was commenced within two years of the date plaintiff discovered defendants' fraudulent conduct and within five years of the dissemination of the false and misleading statements at issue here.

## LOSS CAUSATION/ECONOMIC LOSS

95.     During the Class Period as detailed herein, defendants engaged in a scheme and wrongful course of business by engaging in the accounting fraud and manipulation of the Company's actual financial results, as detailed herein, which artificially inflated the price of Dana securities and operated as a fraud or deceit on Class Period purchasers of Dana's securities. Defendants caused Dana's earnings to be improperly inflated by as much as 38%. When the impact of defendants' fraudulent conduct was disclosed to the market, Dana's stock price fell precipitously as the artificial inflation created by defendants' misrepresentations and wrongful course of business came out of the Company's stock price.  As a result of their purchases of inflated Dana securities during the Class Period – and the subsequent decline in the price of those securities – plaintiff and other members of the Class suffered damages under the federal securities laws.

- 32 -

96.     Defendants' conduct was designed to and did cause Dana equity and debt securities to trade at artificially inflated levels throughout the Class Period, with Dana's stock price reaching as high as $16.72 per share.  That inflation was removed from Dana's securities in a series of disclosures.  On September 15, 2005, Dana announced that it would "likely" restate its financials for 2Q05, write-off portions of its assets and reduce FY05 EPS forecasts.  These public revelations communicated that Dana's business was not performing at the level previously described by Dana's executives.  Investors and the market were surprised by these disclosures, and, as a result Dana's stock price fell almost 23%, on unusually high volume, from $12.78 on September 14, 2005 to $9.86 per share on September 15, 2005.  However, the release did not reflect the truth about Dana's operations and previously reported financial performance or the extent of defendants' wrongful conduct.  Thus, the market had yet to learn the full extent of the problems with Dana's business.

97.     On October 10, 2005, Dana announced that it was retracting its FY05 guidance, restating its FY04, 1Q05 and 2Q05 financial statements and writing down its tax deferred assets.  In response to this announcement, the Company's debt securities declined approximately 10%, while Dana common shares plummeted 35%, trading over 8 million shares on October 10, 2005 alone.

98.     The price decline in Dana's securities as a result of the September 15, 2005 and October 10, 2005 disclosures was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  Although defendants' participation in the fraudulent conduct was not then revealed or reasonably ascertainable, the timing and magnitude of the decline in the price of Dana securities in response to these revelations negates any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic issues, industry factors, or Company-specific facts unrelated to the defendants' fraudulent conduct.

99.    On September 15, 2005, when Dana announced that the Company was reducing its FY05 guidance, probably restating its 2Q05 financial results and looking into whether Dana could maintain its deferred tax assets, Dana's stock price dropped 23% while the Standard and Poor's Index actually *increased* – by 0.05%.  Likewise, although Dana's stock fell 35% in response to Dana's announcement on October 10, 2005 that the Company was retracting its FY05 guidance, restating its FY04, 1Q05 and 2Q05 financial results and writing down its deferred tax assets, the Standard and Poor's Index decreased by 0.72% during the same time-frame.  In sum, as the impact of defendants' manipulation of Dana's reported business performance was revealed to the market, the Company's stock price plummeted, the artificial inflation came out of the stock, and plaintiff and other members of the Class were damaged, suffering substantial economic losses.

100.    The damages suffered by plaintiff and other members of the Class were a direct result of: (a) defendants' fraudulent scheme to artificially inflate the price of Dana's securities during the Class Period; and (b) the subsequent significant decline in the value of Dana's securities when the impact of defendants' prior misrepresentations and other fraudulent conduct became known to the market.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## FRAUD-ON-THE-MARKET DOCTRINE

101.    At all relevant times, the market for Dana's publicly traded securities was an efficient market for the following reasons, among others:

(a)    Dana's securities met the requirements for listing, and were listed and actively traded on the NYSE, which is a highly efficient and automated market;

(b)    As a regulated issuer, Dana filed periodic public reports with the SEC and the NYSE;

(c)    Dana regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of releases on the national

- 34 -

circuits of major news wire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Dana was followed by numerous securities analysts employed by major brokerage firms, including Prudential Equity Group, LLC, Credit Suisse First Boston and Morgan Stanley, who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

102.     As a result of the foregoing, the market for Dana's publicly traded securities promptly digested current information regarding Dana from all publicly available sources and reflected such information in the prices of Dana's publicly traded securities.  Under these circumstances, all purchasers of Dana's publicly traded securities during the Class Period suffered similar injury through their purchase of Dana's publicly traded securities at artificially inflated prices and a presumption of reliance applies.

## CLASS ACTION ALLEGATIONS

103.     Plaintiff brings this action as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of all persons who purchased Dana publicly traded securities during the Class Period (the "Class").  Excluded from the Class are defendants and members of their families, directors and officers of Dana and their families and affiliates as well.

104.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  During the Class Period, Dana had more than 149 million shares of stock outstanding, and over $450 million of debt outstanding owned by thousands of persons.

- 35 -

506277_1

105.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class, which predominate over questions which may affect individual Class members, include:

(a)     Whether the 1934 Act was violated by defendants;

(b)     Whether defendants caused statements to be disseminated which omitted and/or misrepresented material facts;

(c)     Whether defendants caused statements to be asserted which omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and

(d)     Whether defendants knew or recklessly disregarded that their statements were false and misleading.

**CLAIM FOR RELIEF**

**For Violation of §10(b) of the 1934 Act
and Rule 10b-5 Against All Defendants**

106.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

107.     During the Class Period, defendants participated in the preparation of and/or caused to be disseminated the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

108.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Dana securities during the Class Period.

109.    Defendants, individually and together, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about the business, operations and future prospects of Dana as specified herein.

110.    These defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, non-public information and engaged in acts, practices, and a course of conduct as alleged herein by, among other things, participating in the making of untrue statements of material fact and omitting to state material facts necessary in order to make the statements made about the Company and its business operations and future prospects, in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Dana securities during the Class Period.

111.    The defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants' misconduct was engaged in knowingly or with recklessness disregard for the truth, and for the purpose and effect of concealing Dana's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its publicly traded securities.

506277_1

112.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Dana's publicly traded securities was artificially inflated during the Class Period.  In ignorance of the fact that the market prices of the Company's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which the securities trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Dana securities during the Class Period at artificially high prices and were damaged thereby, as demonstrated, in part, by the declines in the price of the Company's stock following its September 15, 2005 and October 10, 2005 announcements.

113.    At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Dana was experiencing, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their Dana securities, or, if they had acquired such securities during the Class Period, would not have done so at the artificially inflated prices which they paid.

114.    By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

115.    As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Dana securities during the Class Period.

506277_1

## PRAYER

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action by certifying it under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such equitable, injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  February 18, 2010                    LANDSKRONER • GRIECO • MADDEN, LLC
                                             JACK LANDSKRONER (0059227)


                                             _____
                                                  /s/ Jack Landskroner
                                             JACK LANDSKRONER

                                             1360 West 9th Street, Suite 200
                                             Cleveland, OH  44113
                                             Telephone:  216/522-9000
                                             216/522-9007 (fax)
                                             E-mail:  jack@landskronerlaw.com

- 39 -

COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
MICHAEL J. DOWD
DEBRA J. WYMAN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
E-mail:  darrenr@csgrr.com
E-mail:  miked@csgrr.com
E-mail:  debraw@csgrr.com

Attorneys for Plaintiff

506277_1