IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Hawaii Ironworkers
    Annuity Trust Fund, *et al.*,                        Case No. 3:10CV371

          Plaintiff

   v.

                                        ORDER
Bernard N. Cole, William E. Hennessey,
    Dennis W. Hodge, and
    Robert E. Steimle

          Defendants

       This is a class action alleging violations of the Securities and Exchange Act of 1934, brought

by lead plaintiff Hawaii Ironworkers Annuity Trust Fund (Fund) on behalf of persons who

purchased publicly traded securities of Dana Corporation (Dana) between February 23, 2005 and

October 7, 2005 (the Class Period). Pending are motions to dismiss by defendants Steimle [Doc. 36],

Cole and Hodge [Doc. 49]; and Hennessey [Doc. 55]. Though filed separately, each motion argues,

in essence that: 1) plaintiffs have not adequately pled reliance and scienter under the Private

Securities Litigation Reform Act of 1995 (PSLRA) and loss causation; and 2) the action is time-

barred by the statute of limitations.

       Jurisdiction is proper under 28 U.S.C. § 1331.

       For the reasons that follow, the motions shall be denied.

## Background

This is a suit arising out of Dana Corp.'s restatement of its earnings several years ago.[1] This action results from an alleged fraudulent scheme and wrongful course of business whereby defendants, high-level Dana employees, caused Dana to issue false financial statements for FY2004 and the first two quarters of FY2005.

Lead plaintiff and institutional investor Fund represents purchasers of Dana's publicly traded securities between February 23 and October 7, 2005.

Dana supplies automotive parts and drive-train systems for light, commercial, and off-highway vehicles. Before and during the Class Period, defendants Cole, Hodge, Hennessy and Steimle worked in one of Dana's main business units, the Heavy Vehicle Technologies and Systems Group (HVG) and/or within HVG's Commercial Vehicle Systems (CVS) division.

HVG manufactures and sell axles, drive shafts, and other components for commercial and off-highway vehicle markets. Cole was president and Hodge was vice president and controller of HVG. Steimle was a controller and Hennessey was general manager of the CVS division.

According to the complaint, the four defendants overstated the results of operations at the CVS unit, representing that Dana was thriving while the automotive parts manufacturing industry was encountering severely adverse conditions. When the overstatements became known, Dana had to redo its financial statements for those quarters. The effect of the restatements on the value of Dana's stock was catastrophic.

---

[1] This case follows the on-going litigation in the related case of *Frank v. Dana Corp.*, No. 3:05-cv-07393 (N.D. Ohio 2005).That case is currently pending oral argument in the Sixth Circuit, No.07-4233.

**Discussion**

**Dismissal Standard**

A claim survives a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*,      U.S.    , 129 S. Ct. 1937, 1949 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all of the complaint's allegations are true." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555–56 (2007).

A complaint is insufficient "if it tenders naked assertions devoid of further factual enhancement." *Iqbal, supra*, 129 S.Ct. at 1949 (citing *Twombly*, *supra*, 550 U.S. at 557) (internal quotation omitted).

I must "construe the complaint in the light most favorable to the plaintiff." *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). Plaintiff, however, must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly, supra,* 550 U.S. at 555; *see also Iqbal*, 129 S. Ct. at 1949 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

**I. Rule 10(b)-5 and Primary Liability**

Defendants claim plaintiff's allegations amount to mere aiding and abetting, which the Supreme Court rejected as a basis for private liability under Rule 10(b)-5 in *Central Bank of Denver N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994). Specifically, defendants allege that plaintiff has failed to plead scienter, reliance, and loss causation with respect to their 10b-5(b)

3

and 10b-5(a) and (c) claims. Plaintiff alleges that defendants themselves have violated each of Rule 10(b)-5's subsections, and thus are primarily liable for their violations.

Section 10(b) prohibits in pertinent part, "any person, directly or indirectly, . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. §78j(b).

Rule 10(b)-5, implemented by the Securities and Exchange Commission, states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. §240.10b-5.

In a typical § 10(b) private action a plaintiff must prove:  1) a material misrepresentation or omission by the defendant; 2) scienter; 3) a connection between the misrepresentation or omission and the purchase or sale of a security; 4) reliance upon the misrepresentation or omission; 5) economic loss; and 6) loss causation. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

4

In *Central Bank of Denver*, the Supreme Court concluded that private liability under § 10(b) and Rule 10b-5 did not extend to secondary actors who merely aided or abetted a 10(b)-5 violation.[2] However, the Court cautioned that its decision did not immunize secondary actors from securities liability. To the contrary, *Central Bank* affirmed liability for any person, "assuming all of the requirements for primary liability for Rule 10b-5 are met." 511 U.S. at 191.

Accordingly, at issue is whether plaintiff's complaint meets all the requirements for Rule 10b-5 primary liability. I will address each requirement in turn.

### A. False or Misleading Statements

Defendants contend that they cannot be primarily liable under 10(b)5-(b) because they did not make any of the false and misleading statements alleged in the complaint.[3]

The PSLRA modifies the Rule 12(b)(6) analysis when reviewing a complaint in a securities fraud action. Under the PSLRA, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

Plaintiff contends that each defendant "participated in the issuance of and caused to be disseminated false and misleading statements and/or failed to disclose material facts about Dana's accounting practices as detailed in ¶¶35-77" of the complaint, which had the effect of artificially inflating the price of Dana's securities. [Doc.1 at ¶¶26-29, 32].

---

[2] Subsequently, Congress enacted section 104 of the PSLRA, which permits the prosecution of aiders and abettors by the SEC, but not by private plaintiffs. 15 U.S.C. § 78t(c).

[3] Defendants do not argue that plaintiff has failed to allege deceptive conduct under 10(b)-5(a) and (c), only that such conduct as is alleged is an insufficient basis for primary liability.

Plaintiff alleges that each defendant was responsible for the accurate and fair presentation of CVS's financial statements, transmitted them to Dana's central accounting function for inclusion in Dana's quarterly financial statements, and signed quarterly and year-end representations stating that the CVS financial results were "fairly presented, accurate and prepared in conformity with GAAP." [Doc. 1 at ¶¶39, 69, 74, 77].

Plaintiff sets forth the specific materially false or misleading statements in paragraphs sixty-seven through seventy-seven of the complaint. They include:

- A February 23, 2005 press release and March 9, 2005 FY04 10-K filed with the SEC reporting Dana's 4Q04 and FY04 financial results. Defendants' actions caused Dana's reported FY04 EBIT to be overstated by 32.4%.

- An April 20, 2005 release, an April 26, 2005 Registration Statement and Prospectus, and a May 6, 2005 10-Q filed with the SEC, each which reported or incorporated by reference Dana's 1Q05 results. Defendants' actions caused Dana's 1Q05 EBIT to be overstated by 37.8%.

- A July 20, 2005 press release and July 29, 2005 Form 10-Q for 2Q05, filed with the SEC, reporting Dana's 2Q05 financial results. The release noted that "The Heavy Vehicle Technologies and Systems Group continued to benefit from the strong commercial and off-highway markets. Its sales grew by 21 percent in the second quarter compared to the same period last year; [and]-Heavy vehicle profits were up 19 percent compared to the second quarter of 2004." The "financial performance metrics [of Dana's Form 10-Q for 2Q05 reporting HVG's and Dana's results] were manipulated by defendants' accounting malfeasance and other fraudulent actions." Defendants' actions caused Dana's 2Q05 EBIT to be overstated by 19%.

Plaintiff claims each of these statements was:

false and misleading when made [and/or filed with the SEC] and failed to disclose material facts concerning Dana's financial results, business and business practices. *Defendants knew* or recklessly disregarded, but failed to disclose, *that their actions*, as detailed in ¶¶35-77, *caused CVS's financial results to be overstated, which results were incorporated into and were a material part of the results* reported for the Heavy Vehicle Group business unit. *Defendants made sure that these manipulated results would be reported to Dana's investors* as part of the Company's quarterly and

6

year-end reporting requirements required by the SEC, and would be relied upon by investors and the market in their valuation of Dana's stock.

[Doc. 1, ¶74] (emphasis added).[4]

Dana's Forms 10-K and 10-Q filed with the SEC represented that Dana's financial statements were fairly stated in conformity with Generally Accepted Accounting Principles (GAAP), which consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time. Plaintiff alleges that Dana's financial reporting in fact violated GAAP and SEC rules in numerous respects.

Plaintiffs argue, and I agree, that the fact that defendants did not directly communicate a misrepresentation to the public does not necessarily foreclose the possibility of primary liability under 10(b)-5(b). *See, e.g., Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1226 (10th Cir. 1996) ("[t]here is no requirement that the alleged violator directly communicate misrepresentations to plaintiffs for primary liability to attach."); *see also City of Monroe Emples. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 686 (6th Cir. 2005).

Plaintiff has alleged that each of the defendants was closely involved in fraudulent manipulations of CVS' and HVG's financial results and had control over the information passed along to Dana's accountants and reflected in Dana's press releases and SEC filings. Of particular note is a July 20, 2005 press release drawing special attention to the growth in sales and profits at HVG.

Plaintiff sufficiently alleges that defendants substantially participated in the alleged misstatements. *See, e.g, In re Cadence Design Sys., Inc. Sec. Litig.*, 692 F. Supp. 2d 1181, 1192 n.8

---

[4] This paragraph is repeated for each allegedly misleading statement, with only slight differences in phrasing. *See* Doc. 1, ¶¶ 69, 74, 77.

(N.D. Cal. 2010) (citing *Cooper v. Pickett*, 137 F.3d 616, 625 (9th Cir. 1997) and *SEC v. Fraser*, No. 09-443, 2010 WL 5776401, *13-15 (D. Ariz. Jan. 28, 2010)).

Plaintiff thus has sufficiently alleged the defendants made a misrepresentation under Rule 10(b)-5(b) to survive a motion to dismiss. However, plaintiff's contention that the fact that defendants were not identified as the speakers of the false financial results reported to investors in Dana's press releases, conference calls and SEC filings is of no consequence is only partially correct. Whether the public would attribute the false financial results to the defendants goes to the issue of reliance, as discussed *infra*.

### B. Reliance

Liability under a private 10b-5 cause of action requires a showing of reliance—that the investors relied upon a material misrepresentation or deceptive conduct in making an investment decision, and that their reliance was justified or reasonable. *E.g., Basic, Inc. v. Levinson*, 485 U.S. 224, 243 (1988); *Cent. Bank of Denver, supra*, 511 U.S. at 178-80. "Reliance provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury." *Basic, supra,* 485 U.S. at 243.

As noted above, § 10b-5 does not support private suits against aiders or abetters of securities fraud, because to do so would impose liability without reliance. *Central Bank, supra*, 511 U.S. at 180.

It is unsurprising, therefore, that the Supreme Court in *Stoneridge, supra*, 552 U.S. 148, held that third-party vendors who did nothing more than transact business with an issuer cannot be liable to the issuer's investors under §10(b) of the Securities Exchange Act and Rule 10b-5 in the absence

8

of any public statement or other conduct by those third parties on which the investors could have relied.

In *Stoneridge*, the plaintiffs showed reliance, but the Court found the reliance to be on deceptive conduct too remote for liabilty. The Court found dispositive that "nothing defendants did made it necessary or inevitable for Charter [the primary wrongdoer] to record the transactions as it did." *Id.* at 161.

Defendants here equate themselves with the defendants in *Stoneridge*—mere participants in a fraudulent scheme with a relationship to the fraud too tenuous on which to base primary liability. Plaintiff alleges that defendants are liable for violating each of Rule 10b-5's subsections; liable both for their deceptive conduct and making affirmative false financial statements in press releases, conference calls and SEC filings during the class period.

The reliance inquiry asks, in essence, whether an indirect chain to the contents of false public statements is too remote to establish primary liability. *Pugh v. Tribune Co.*, 521 F.3d 686, 696-97 (7th Cir. 2008). This is a fact-based inquiry and requires an examination of defendants' proximity to the violations alleged.

### 1. Reliance on Misstatements Without Attribution

Defendants argue that plaintiff has failed to show reliance because the misstatements were not attributed to the defendants. Plaintiff responds that it is irrelevant that nothing identified the defendants as the sources of the false financial results in Dana's press releases, conference calls and SEC filings. This is so, plaintiff contends, because defendants, who were responsible for providing

accurate information in CVS's financial statements, played a significant role in producing those documents.[5]

Since *Stoneridge*, many courts have held that where a defendant is a third-party— *i.e.* not a corporate insider—there can be no liability without attribution. *See, e.g., Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 148 n.1 (2d Cir. 2010); *see also, In re Mutual Funds Inv. Litig.*, 566 F.3d 111, 124-127 (4th Cir. 2009), *cert. granted*, 130 S. Ct. 3499 (2010) (requiring attribution, but suggesting attribution can be implicit where investors would infer the third party's participation).[6]

This attribution requirement *vis-a-vis* third parties arises from the Supreme Courts's rejection of scheme liability in *Stoneridge*, where the causal connection between the defendant's misrepresentation and the plaintiff's injury was too tenuous for liability. *See Affco Invs. 2001 LLC v. Proskauer Rose L.L.P.*, 625 F.3d 185, 193-194 (5th Cir. 2010).

---

[5] Plaintiff claims that "this is precisely the situation contemplated in *City of Monroe Emples. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651 (6th Cir. 2005)." [Doc. 60 at 42]. In that case the court posited in a dictum footnote:

> The requirement that the plaintiff allege that the defendant made a misrepresentation does not mean that the plaintiff must allege the defendant communicated that misrepresentations to the plaintiff. If the Retirement Fund can show that Firestone was the originator of Bridgestone's misrepresentation regarding Firestone and that Firestone knew or should have known that its misrepresentation would be communicated to investors, primary liability should attach.

*Id.* at 686. This comment recognized the possibility that a provider of false information might be liable for the misstatements incorporating such information. But *City of Monroe* was not such a case. The court did not discuss in any meaningful way what the elements of a proper case would be.

[6] The Fourth Circuit found that despite a lack of explicit attribution, the reliance could be based on the fact that "interested investors would infer that [third party] played a role in preparing or approving the content of the [mutual fund's] prospectuses." *Id.* at 127.

Where, as here, the defendant is a corporate insider, courts have engaged in a fact-intensive inquiry to determine whether, despite the lack of direct attribution, reliance nonetheless may be found. For example, the Second Circuit found that a corporate officer may be liable for a corporation's misrepresentations not attributed to him where the officer was primarily responsible for the corporation's communications and was involved in the drafting, producing, reviewing and/or disseminating false and misleading statements. *In re Scholastic Corp. Securities Litigation*, 252 F.3d 63, 75-76 (2d Cir. 2001); *see also, In re Cadence Design Sys., Inc. Sec. Litig.*, 692 F. Supp. 2d 1181, 1192 n.8 (N.D. Cal. 2010) (holding that a corporate insider who had control over information included in the company's public statements can be liable for violating Rule 10b-5(b)).

Plaintiff alleges that the defendants, like those in *In re Cadence* and *In re Scholastic*, controlled the information Dana incorporated in its statements and thus played a role in and were responsible for Dana's misrepresentations. According to plaintiff, each defendant engaged in falsification of financial information, transmitted that false information to Dana's central accounting function for inclusion in Dana's quarterly financial statements, and averred that the CVS reported financial results were "fairly presented, accurate and prepared in conformity with GAAP." [Doc. 1 at ¶¶39, 69, 74, 77]. Though the defendants dispute these contentions, at this stage, I must take the allegations in the complaint as true. *Inge, supra*, 281 F.3d at 619.

Dana's decision to highlight HVG and its skyrocketing profits in its July 20, 2005, press release supports the allegation of reliance:  a reasonable investor would understand that the information was likely provided by the executives in that division. *See LaBranche Sec. Litig.*, 405 F.Supp. 2d 333, 351 (S.D.N.Y. 2005) (concluding that when a parent company reports financial information that investors understand "could have been provided only" by its subsidiary, the

11

subsidiary can be deemed to be the speaker); *see also In re Mutual Funds Inv. Litig., supra* 566 F.3d at 127.

### C. Reliance on 10(b)-5(a) and (c) and Deceptive Conduct

In addition to the allegation that defendants made false and misleading statements in violation of Rule 10(b)5-(b), plaintiff contends that defendants are liable under 10(b)-5(a) and (c) for deceptive conduct. Conduct can be deceptive and provide a basis for primary liability. *Stoneridge, supra,* 128 S. Ct. at 770. Conduct is, however, actionable only when there is "the requisite proximate relation to the investors' harm . . . . Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action." *Id.* at 769.

In *Stoneridge*, the third-party vendors' deceptive acts were not communicated to the public: "[n]o member of the investing public had knowledge, either actual or presumed, of [the vendors'] deceptive acts during the relevant times." As a result, investors could not show any reliance on the vendors' actions "except in an indirect chain" that the Court found "too remote for liability." *Id.* at 159. *Stoneridge* and its progeny thus suggest that the key inquiry in determining whether a secondary actor can be primarily liable for a § 10(b) violation is whether the secondary actors' actions or conduct "were immediate or remote to the injury." *Id.* at 160.

In *Pugh, supra*, 521 F.3d at 696, the Seventh Circuit held an employee was not liable under § 10(b) for a fraud at the subsidiary level that foreseeably resulted in an overstatement of revenue in the parent company's financials. In that case, plaintiffs alleged employees of Newsday, a subsidiary of the Tribune Company, falsely certified circulation numbers for two Tribune publications, thereby inflating Tribune's reported revenues.

12

Investors sought to hold those employees responsible for losses resulting from reliance on Tribune's overstated revenues. The court rejected primary liability for the mastermind of the circulation scheme, concluding that: 1) the defendant had no role in preparing or disseminating Tribune's financial statements or press releases; and 2) there was no allegation that Tribune investors ever learned about the defendant's false certifications to the Tribune's subsidiary.

A relationship between underlying false information and publicly reported financial results was not enough in *Pugh* to impose liability on the individual responsible for the initial fraud. The court noted that "*Stoneridge* indicates that an indirect chain to the contents of false public statements is too remote to establish primary liability. Without allegations establishing the requisite proximate relation between the [newspaper circulation] fraud and the Tribune investors' harm, we cannot uphold the complaint." *Id.* at 697.

Plaintiff alleges that the proximate relation between the defendants' fraudulent conduct and the harm to Dana's investors is closer than in *Pugh*, and is akin to the nexus between fraud and reported results in *In re Bristol Myers Squibb Co. Sec. Litig.,* 586 F. Supp. 2d 148 (S.D.N.Y. 2008). The court there denied a motion to dismiss where a corporate officer negotiated a settlement containing illegal side-agreements and later failed to correct a misstatement by the company in its description of the settlement. *Id.* at 170.

The court found that the defendant's behavior was "at the heart of Bristol-Myers's false and misleading conduct. It is neither implausible, nor too remote to find that the investing public relied on the announcement" of the settlement the defendant negotiated. *Id*. Though the defendant made

13

no public statements, the court differentiated *Stoneridge* on the basis that the company made the defendant's conduct known to the public. *Id.*[7]

Plaintiff asserts that here, too, the company made the defendants' false information known to the investing public, thereby enhancing investor confidence in Dana's overstated earnings reported in Dana's press releases and SEC filings.[8]

Of importance for the reliance inquiry is the fact that Dana drew particular attention to the success of the Heavy Vehicle Group. On July 20, 2005, Dana issued a release reporting its 2Q05 financial results. The release reported 2Q05 EBIT of $59 million for HVG and 2Q05 EBIT for Dana of $92 million. The release noted Dana's 2Q05 net income of $53 million, an increase of almost 300% over 1Q05. Stating that the reported financial results "showed significant improvement over results for the first three months of the year," the release provided:

- The Heavy Vehicle Technologies and Systems Group continued to benefit from the strong commercial and off-highway markets. Its sales grew by 21 percent in the second quarter compared to the same period last year; [and]

- Heavy vehicle profits were up 19 percent compared to the second quarter of 2004.

[Doc. 1 at ¶ 75].

The defendants provided false information that Dana not only incorporated into its financial reports but also highlighted in public statements. The information the defendants gave to Dana played a major role in falsely inflating public reports of the company's overall (and remarkable)

---

[7] Defendant Hennessey's contention that he cannot be held liable without breaching a duty to disclose is without merit: "Rule 10b-5(a) and (c) encompass conduct beyond disclosure violations." *Benzon v. Morgan Stanley Distributors, Inc.*, 420 F.3d 598, 610 (6th Cir. 2005).

[8] Plaintiff alleges that, due to defendants' fraudulent reporting, Dana overstated it pre-interest and -tax earnings in the aggregate by $31.6 million, or 26.5%.

financial success during a very challenging period. These circumstances, and the direct nexus they show between the defendants' fraudulent conduct and the publication of false information to the investing public differentiates this case from *Stoneridge* and *Pugh.*

As in *Bristol Myers*, and in contrast to *Pugh*, the complaint here alleges each defendant in this case held a position of significant responsibility during the Class Period. This is so, notwithstanding defendants' suggestions in their briefs to the contrary. But for their allegedly knowing and intentional misinformation over a series of quarters, the investing public would have known the truth and could have made informed decisions. A fair reading of the complaint indicates that the inability of the investors to assess the true value of Dana's shares resulted directly from the misconduct of these defendants.

Defendants contend that they were mere aiders and abettors who merely assisted the fraud perpetrated by their superiors. Viewed, however, most favorably to the plaintiff, the complaint bears a contrary reading:  namely, that those who spoke directly to the investing public merely conveyed to the public the defendants' conduct that was at the heart of the fraud. While defendants' superiors could have snuffed out what the defendants had started, the fact that they did not do so does not relieve defendants of exposure to culpability as primary participants, even if they and their role was hidden in the shadows from investors' eyes. *See In re Nat'l Century Fin. Enters., Inc. Fin. Inv. Litig.*, 553 F. Supp. 2d 902, 909 (S.D. Ohio 2008) (defendants not merely aiders and abettors where alleged conduct by each was deceptive, rather than non-deceptive); *see also In re Able Labs. Sec. Litig.*, 2008 WL 1967509(D.N.J. Mar. 24, 2008) (conduct of a secondary actor must satisfy each of

the elements or preconditions for liability; defendant may be accountable even though not an architect or mastermind of the fraudulent scheme to defraud investors).[9]

The complaint here alleges more than mere incidental and insignificant help in creating the falsely bright picture that others presented to the public. According to the complaint, the defendants sketched out and helped fill in that picture during the entire period it was on display. If the jury finds truth in the plaintiff's allegations, it might also find that, but for the defendants' handiwork, the public all along would have seen the real Dorian Gray.

### D. Scienter

The PSLRA imposes heightened requirements on plaintiffs at the pleading stage to "screen out" lawsuits with "no factual basis." *Miller v. Champion Enterprises*, 346 F.3d 660, 691, 692 (6th Cir. 2003). Under the PSLRA, a plaintiff's complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" to adequately plead scienter. 15 U.S.C. § 78u-4(b)(2). Pleading any fraud claim requires great particularity, Fed. R. Civ.

---

[9] In *Pugh*, the defendant certified falsified circulation records of a subsidiary's publications to an independent auditor. While involving an important aspect of the company's finances, the fraud was limited to that aspect alone. The effect of the defendant's fraud was, moreover, indirect: the defendant was not responsible for preparing, or overseeing and approving the preparation of the company's financial reports to the parent company. Those who did so may have neglected their gate-keeping duties when they incorporated the defendant's figures in their financial data. In any event, the defendant in *Pugh* was quite distant from those responsible for the public statements about the parent's financial performance.

Here, in contrast, the defendants manipulated several components of the unit's financial activities. Their deceit encompassed, according to the complaint: recognizing sales transactions without a prerequisite transfer of assets and/or risk of loss; recording sham transactions eliminating debts to Dana's suppliers; issuing fictitious invoices having no contractual basis; recognizing revenue on never-agreed-to price increases; and failing to record steel surcharges incurred by Dana. The scope of the defendants' fraudulent reports appears much broader than the scope of the defendant's misconduct in *Pugh*.

In addition, the impact of their multi-factored and prolonged misconduct on Dana's financial circumstances was more direct than the effect of the defendant's actions in *Pugh*.

16

P. 9(b); under the PSLRA a plaintiff must meet "even higher standard for pleading scienter in a securities-fraud case." *Ley v. Visteon Corp.*, 543 F.3d 801, 809 (6th Cir. 2008). The required state of mind includes "knowing and deliberate intent to manipulate, deceive, or defraud" and recklessness. *Id.*

In *Tellabs v. Makor Issues & Rights*, 551 U.S. 308, 319-320 (2007), the Supreme Court prescribed a three-step analysis for determining the adequacy of a complaint. First, a court must "accept all factual allegations in the complaint as true." *Id.* at 322. Second, courts must "examine the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss." *Id.*

Third, to determine whether "the pleaded facts give rise to a 'strong' inference of scienter, a court must take into account plausible opposing inferences." *Id.* This is a "comparative inquiry" that requires a court to consider "plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff" and determine which is more probable. *Id.*

A complaint survives a motion to dismiss only if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. Where two equally compelling inferences can be drawn, one demonstrating scienter and the other supporting a non-culpable explanation, *Tellabs* instructs that the complaint should be permitted to move forward.

Defendants allege that the complaint fails to raise facts sufficient to infer the defendants' intention "to deceive, manipulate, or defraud" to be not just plausible, but cogent and at least as compelling as any opposing inference regarding their intent. Defendants claim plaintiff has merely

made conclusory statements concerning state of mind which cannot be subjected to the scrutiny that *Tellabs* requires.

Plaintiff responds that most plausible inferences flowing from the complaint's allegations support the conclusion that defendants knew of, or were reckless with regard to, the accounting fraud at CVS and the false positive effect it had on Dana's financial results reported during the Class Period.

To be sure, accounting violations themselves do not show scienter. *In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 487, 501 (S.D. Ohio 2000). But the complaint here alleges much more than sloppy bookkeeping or insufficient attention to detail.

Plaintiff alleges that defendants deliberately manipulated CVS's revenue and accounts payable to meet pressure Dana was imposing on them to achieve unattainable six percent profit increases. Aside from all else that such demand implied, defendants' jobs were at stake. The complaint also alleges that defendants knew this false financial information would be communicated to investors.

The complaint alleges each defendant's personal participation in and knowledge of with the fraudulent the revenue and accounts payable manipulations used to inflate CVS's earnings.

Hennessy was personally responsible for creating CVS's "one-off" agreements with Sypris that allowed CVS to improperly recognize more than $3.3 million in revenue in FY04. In violation of GAAP, Hennessy, along with Hodge and Steimle (the Heavy Vehicle Group's and CVS's controllers, respectively) agreed to record this revenue despite the fact that Dana maintained possession of the equipment and parts allegedly sold and remained responsible for the risk of loss.

18

As alleged, the revenue from these one-off agreements was a material factor in Dana reporting overstated FY04 EBIT by 32%.

The complaint gives three specific instances of recognition, in contravention of GAAP, of revenue for unilateral price increases that Dana's customers never agreed to. The complaint alleges each defendant was aware of this practice, through which Hennessey and Steimle directed plant controllers to record the improper revenues.

Cole was directly involved in negotiating these increases, and along with Hennessy and Hodge, received emails and correspondence directly from CVS customers showing the price increase negotiations were ongoing at the same time defendants were instructing Steimle to record the increases as revenue. Plaintiff asserts that Steimle protested, showing he knew this practice was wrong but engaged in it anyway. These facts suggest that each of the defendants was aware (or reckless in disregarding) that customers had not agreed to the increases, but caused revenue to be recorded as if they had.

Plaintiff alleges that Hennessy and Steimle also created fake debit-memos to suppliers in order to reduce CVS's accounts payable. The debit memos had no contractual basis, and unilaterally required suppliers to reduce outstanding amounts payable. Hodge, as controller, was privy to this deliberate practice. The complaint gives specific instances of this practice, including customer descriptions, the nature of the debit-memos, and the impact it had on Dana's EBIT reported during the Class Period.

The complaint also details the defendants' actions in improperly deferring steel surcharges, names the suppliers involved, the amounts deferred, and the impact Dana's reported results during the Class Period. The deliberateness of defendants' conduct can be plausibly inferred from the

19

allegations that Steimle, Hennessy and Hodge, to meet revenue shortfalls, recorded some of these transactions after CVS's books were closed.

Taken together, plaintiff argues these allegations support a cogent and compelling inference that defendants knew of, or were reckless with regard to, the accounting fraud at CVS and the false positive effect it had on Dana's financial results reported during the Class Period. This inference is at least as strong than any competing inference of mere mismanagement, poor judgment, or negligence as proffered by defendants.[10]

Defendants argue that the scienter allegations in the complaint are undermined by the fact that they are copied from the SEC complaint, which does not contain a supporting factual statement.

The PSLRA requires that plaintiff provide "documentary evidence and/or a sufficient general description of the personal sources of plaintiffs' beliefs." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000). Plaintiff contends that the SEC qualifies as a reliable source for pleading purposes and plaintiff may rely on the publicly available information the SEC disclosed about the deceptive conduct engaged in by defendants in framing its allegations to satisfy the PSLRA.

Plaintiff suggests that the SEC should be taken at its word, stating that "There is no doubt that the SEC—having conducted a three-year-long investigation and having had access to Dana's

_____

[10] Defendant Steimle argues that even if one assumes that plaintiff's allegations concerning his conduct are true, the more compelling and cogent inference from the complaint is that Steimle intended to defraud his own superiors in order to enhance his opportunity for continued employment and success at Dana. I disagree. The suggestion that Steimle was motivated to save his job only strengthens the inference that he acted with scienter. *Tellabs, supra,* 511 U.S. at 326 (motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference); *see also Ley, supra*, 543 F.3d at 810.

internal information and key witnesses—had ample support for the information it publicly disclosed following its investigation." [Doc. 60 at 47].

Plaintiff states that the court in *De La Fuente v. DCI Telecomms.*, Inc., 259 F. Supp. 2d 250 (S.D. N.Y. 2003), specifically rejected the defendants' argument that the complaint did not comply with the PSLRA because it "simply copies the SEC complaint" and is "based only on the word of the SEC." *Id.* at 259.

I find support for plaintiff's position in *SEC v. Lee*, 720 F. Supp. 2d 305, 341 (S.D.N.Y. 2010), which acknowledged that "there is nothing improper about utilizing information contained in an SEC complaint as evidence to support private claims under the PSLRA," and added that the plaintiff's reliance in that case on the SEC and other governmental "allegations does not demonstrate that it lacks evidentiary support, but rather provides it with the necessary evidentiary support." *Id.* (citing *De La Fuente, supra*, 259 F. Supp. 2d at 260, for the proposition that an SEC complaint may provide more evidentiary support then similar claims based upon media reports).

I find, therefore, that all of the facts alleged, taken collectively, give rise to a strong inference of scienter.

### E. Loss Causation

The PSLRA, 15 U.S.C. § 78u-4(b)(4), requires plaintiff to show "that the act or omission of the defendant alleged to violate this chapter caused the loss for which plaintiff seeks to recover damages." Defendants Steimle, Cole and Hodge argue that plaintiff has not sufficiently plead loss causation.

The PSLRA "expressly imposes on plaintiffs 'the burden of proving that the defendants' misrepresentations 'caused the loss for which the plaintiff seeks to recover.''" *Dura Pharms, Inc. v.*

21

*Broudo*, 544 U.S. 336, 345-46 (2005) (quoting 15 U.S.C. § 78u-4(b)(4)). However, the Supreme Court explained in *Dura* that the pleading rules for loss causation were "not meant to impose a great burden upon a plaintiff," and that plaintiffs need only plead "a short and plain statement," pursuant to Fed. R. Civ. P. 8(a)(2), that provides defendants with "some indication of the loss and the causal connection that the plaintiff has in mind." *Id*. at 346-47 (citations omitted).

To do so, plaintiff must:  1) plead, and ultimately must prove, that a company's share price fell significantly after the truth became known; 2) specify the relevant economic loss; and 3) describe the causal connection between the loss and the misrepresentation. *Id.* at 347.

Plaintiff premises loss causation on its contentions that defendants' misconduct inflated the price of Dana stock, plaintiff purchased Dana stock at an inflated price, and the price of Dana stock fell drastically as a result of the revelation of the fraud in Dana's September 15 and October 10, 2005 disclosures.[11] These allegations provide a direct link between plaintiff's losses and defendants' accounting fraud.

The September 15, 2005 press release stated:

Company Likely to Restate Second-Quarter 2005 Financial Statements

Dana also announced that it will likely restate its second-quarter 2005 financial statements, primarily to correct inappropriate recognition of price increases in its Commercial Vehicle business during the second quarter. Based on a preliminary internal review, the company believes that the potential restatement could result in

---

[11] Lead Plaintiff sold all of its Dana stock on Sept 19, 2005. [Schedule A to the February 12, 2010 Certification filed with the complaint.] Plaintiff's reliance on the effect of the October 10, 2005 disclosure for the purposes of pleading loss causation is appropriate only with respect to class plaintiffs who had not sold before both disclosures were made. *See In re Compuware Sec. Litig.*, 386 F. Supp. 2d 913, 916 (E.D. Mich. 2005) (plaintiff failed to plead loss causation where "alleged fraud caused no loss to [plaintiff] since it had already sold all of its stock in Defendants at the time the corrective disclosure was made.")

an after-tax reduction of approximately $10 million to $15 million in second-quarter income.

[Doc. 1 at ¶ 78].

Following this disclosure, Dana's stock price fell more than twenty percent. [Doc. 1 at ¶79].

The October 10, 2005 press release stated:

Dana's management and the Audit Committee of the Board of Directors have determined, as a result of their ongoing internal investigations, that the company did not properly account for certain items during 2004 and the first and second quarters of 2005. As a result, management and the Audit Committee have concluded that Dana's financial statements for these periods should no longer be relied upon and that restatements will be required for these periods. The primary purpose for the restatements is to correct issues involving customer pricing and transactions with suppliers in Dana's Commercial Vehicle business.

[Doc. 1 at ¶ 82].

Plaintiff alleges that as a result of these disclosures, Dana's stock price fell an additional 35%. [Doc. 1 at ¶83].

Defendants Cole, Hodge and Steimle argue that the law requires that plaintiff plead loss causation by showing not only that the trading price of shares declined after the Fall 2010 disclosures, but that the disclosures revealed the alleged fraud to the market. Plaintiff contends that it suffices to plead that the price declines in Dana shares following the disclosures were "a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market." [Doc. 1 at ¶ 98].

Plaintiff has the better argument. While it is true that the purposes of securities actions is "not to provide investors with broad insurance against market losses," *Dura, supra*, 544 U.S. at 345, it is sufficient that the decline results from revelation of the falsity of prior disclosures. As stated in *Dura,*:

> one who misrepresents the financial condition of a corporation in order to sell its stock will become liable to a purchaser who relies upon the misinformation for the loss that he sustains when the facts as to the finances of the corporation become generally known and as a result the value of the shares is depreciated on the market, because that is the obviously foreseeable result of the facts misrepresented.

*Id.* at 344 (citing the Restatement (Second) of Torts §548A(b) (1977)); *see also In re Williams Sec. Litig.-WCG Subclass,* 558 F.3d 1130, 1140 (10th Cir. 2009); *Alaska Electrical Pension Fund v. Flowserve Corp.,* 572 F.3d 221, 231 (5th Cir. 2009).

The announcement that Dana would have to restate its financials to "correct inappropriate recognition of price increases," that an "ongoing internal investigation" had revealed that its financial statements "should no longer be relied upon," and the identification of CVS as the problematic division alerted investors to the falsity of Dana's FY04, 1Q05 and 2Q05 financial results.[Doc. 1 at ¶78-82; Doc. 60 at 22].

Defendants rely on *D.E. & J. Ltd. P'ship v. Conway*, 284 F. Supp. 2d 719 (E.D. Mich. 2003), aff'd., 133 Fed. App'x. 994, 999 (6th Cir. 2005) (unpublished disposition), for their contention that plaintiff has failed to plead loss causation because the disclosures revealed to investors only the economic impact of the fraudulent scheme, without disclosure of the misconduct itself. The court in *D.E. & J.* held that a stock price drop following the downgrade of stock does not amount to a corrective disclosure because the downgrades did not reveal to the market the falsity of the prior recommendations. The Sixth Circuit noted that plaintiffs did not allege that "Kmart's bankruptcy announcement disclosed any prior misrepresentation to the market." *Id.* at 1000.

*D.E. & J.* is readily distinguishable. In that case the plaintiff did not attempt to allege any causal connection between the stock price drops and the defendants' earlier misstatements but instead sought to establish loss causation on allegations of price inflation alone. *Id.* at 999-1000.

24

Next, defendants argue that even if it were not necessary that the corrective disclosure reveal the fact of fraud at CVS, plaintiff has failed to plead loss causation because the corrective disclosures gave additional negative information about Dana's finances that could have caused its stock to drop.

However, the pleading need only show that the corrective disclosure was a substantial cause of the loss, not the only cause. *E.g., In re Mut. Funds Inv. Litig.*, 566 F.3d 111, 128 (4th Cir. 2009); *In re Daou Systems, Inc*., 411 F.3d 1006, 1025 (9th Cir. 2005); *Semerenko v. Cendant Corp*., 223 F.3d 165, 186-87 (3d Cir. 2000). Where the defendant alleges the securities' decline in value is attributable to other intervening factors, the weight given to each cause is a matter for the damages inquiry, not a pleading requirement. *In re Daou, supra,* 411 F.3d at 1025.

The rapid decline of Dana's stock price following the news of inappropriate recognition of price increases in CVS indicates a substantial causal link between the defendants' alleged accounting fraud at CVS and the value of Dana's stock.

I conclude that plaintiff's allegations are sufficient to plead loss causation under Fed. R. Civ. P. 8 and *Dura.*

### III. Statute of Limitations

A plaintiff may bring a private securities action not later than the earlier of either:  1) two years after the discovery of facts constituting the violation; or 2) five years after such violation.[12]

---

[12] Defendant Steimle argues that portions of the complaint relating to more than five years before the complaint was filed (*i.e.* before February 18, 2005) are untimely. Section 1658(b)(2) contains an "unqualified bar on actions instituted '5 years after such violation,' giving defendants total repose after five years." *Merck, supra*, 130 S.Ct. at 1797. Plaintiff brought this action within five years of the first violation alleged in the complaint—the communication of defendants' falsification of Dana's FY04 results to investors on February 23, 2005. Thus, the statute of repose is not a factor in this matter.

28 U.S.C.A. §1658. The statute of limitations "begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have 'discover[ed] the facts constituting the violation'— whichever comes first." *Merck & Co. v. Reynolds*, 559 U.S.    ,    , 130 S. Ct. 1784, 1798 (2010) (quoting 28 U.S.C. § 1658(b) (1)).

 Defendants assert plaintiff's claim is untimely. They allege that a diligent plaintiff would have had all the facts necessary for the current complaint more than two years prior to when plaintiff filed this suit. Plaintiff filed the original complaint on February 18, 2010, so its claims would be time-barred only if the statute of limitations began to run before February 18, 2008.

To determine whether the complaint was timely, the key is when the plaintiff did or should have discovered the facts constituting the 10b-5 violation. Each party asserts that the other bears the burden of proof on this issue. Because plaintiff has adequately alleged that it did not discover, and defendants have not shown that a reasonably diligent plaintiff could have discovered, the facts constituting scienter until September 2009, defendants' motions to dismiss on this basis are denied.

## A. Burden of Proof

Generally speaking, the statute of limitations is an affirmative defense on which the defendant bears the burden of proof. *See* Fed. R. Civ. P. 8(c)(1); *see also Take-Two Interactive Software, Inc. v. Brant*, 2010 WL 1257351 (S.D.N.Y. Mar. 31, 2010); 1-12 Securities Practice Guide § 12.06 ("the statute of limitations is an affirmative defense on which defendants bear the burden of pleading and proof.").

Defendants assert that, in the securities fraud context, the discovery rule that tolls the statute until the reasonable discovery of the fraud places the burden on the party seeking its safe harbor to establish sufficient facts to show when it should have known of the fraud.

26

In making this contention, defendants rely on cases predating the Supreme Court's recent clarification of the discovery rule in *Merck, supra*, 559 U.S.   , 130 S. Ct. 1784. The Court held that inquiry notice does not trigger the statute of limitations. *Id.* at 1796. The Court's application of the discovery rule in *Merck* is therefore the most persuasive elucidation of the proper allocation of the burden of proof in securities fraud cases.

 In *Merck,* a group of investors brought a securities fraud class action against Merck, alleging that it knowingly misrepresented a drug's health risks which led to losses when the risks later became apparent. *Id.* at 1784. In response, Merck filed a motion to dismiss, arguing that the complaint was untimely under the discovery rule because plaintiffs knew or should have known the facts constituting the violation more than two years before filing the complaint. *Id.* at 1790.

The district court, holding that inquiry notice triggered the statute of limitations, shifted the burden of proof. *In re Merck,* 483 F. Supp. 2d 407, 418 (D.N.J. 2007). The district court found that the plaintiffs had failed to "show that they exercised reasonable due diligence but nevertheless were unable to discover their injuries," and found the complaint untimely. *Id.* at 424. Defendants ask that I do likewise here.

However, the Supreme Court rejected this interpretation and application of the discovery rule, recognizing that the statute contains no indication that the limitations period can sometimes begin before discovery can take place. *Merck, supra,* 559 U.S.  , 130 S. Ct. 1784, 1796. The Court reviewed the evidence on the record and concluded that it did not "reveal facts indicating scienter" at any point more than two years prior to when the plaintiffs filed their suit. *Id.* at 1799.[13]

---

[13] The Court held that whether the defendant acted with the requisite state of mind, is a "fact" for purposes of § 1658(b)(1), so that limitations does not begin to run until the plaintiff discovered or should have discovered that element. *Merck, supra,* 559 U.S.  , 130 S. Ct. at 1798.

The Court held that, to find the complaint timely, it:

> need only conclude that prior to [two years before plaintiffs filed their suit], the plaintiffs did not discover, and *Merck has not shown that a reasonably diligent plaintiff would have discovered,* 'the facts constituting the violation.' In light of our interpretation of the statute, our holdings in respect to scienter, and our application of those holdings to the circumstances of this case, we must, and we do, reach that conclusion. Thus, the plaintiffs' suit is timely.

*Id.* (emphasis added).

The Court placed the burden of proving that a reasonably diligent plaintiff would have discovered the facts constituting the violation at a given time squarely on the shoulders of the defendant.

### B. Facts Indicating Scienter

Defendants Cole and Hodge assert that "[e]ven assuming that, subsequent to *Merck*, defendants must show that a reasonably diligent plaintiff would have discovered the facts sufficient to avoid dismissal of a Section 10(b) complaint, the record on this motion more than makes that showing." [Doc. 50 at 40]. I disagree.

Here, plaintiff alleges that despite "a thorough and diligent investigation by Lead Plaintiffs," [Doc. 1 at ¶ 94], it first discovered the facts regarding scienter after the SEC complaint was published on September 11, 2009. Nor could it have discovered such facts sooner, it argues, because a PSLRA discovery stay in the 2005 Action limited the investigation to publicly available information and voluntary informal interviews with potential witnesses that plaintiff was able to identify from available information.

To show that a reasonably diligent plaintiff would have discovered facts sufficient to plead scienter prior to two years before plaintiff filed this suit, defendants rely on: 1) the *Frank* case; and 2) Dana's SEC filings and press releases in late 2005 and early 2006.

28

### 1. The *Frank* Case

The defendants cite *Frank v. Dana Corp*., 3:05-cv-07393 (N.D. Ohio 2005), a shareholder action against Dana, its CEO and its CFO, as demonstrating beyond reasonable dispute that plaintiff's counsel was aware of the possibility of securities law violations within Dana from at least January 2006.

This argument is without merit. Plaintiff claims that it was unable to identify these defendants' involvement in the scheme with the information and resources available to them in the exercise of due diligence. [Doc. 1 at ¶¶ 90-94]. The existence of the *Frank* case, which involved different defendants, therefore does not in itself provide any evidence of culpable scienter on defendants' part.

### 2. SEC Filings and Press Releases

Defendants assert that publically available information would have alerted a reasonably diligent plaintiff to the existence of facts showing that these defendants acted with scienter more than two years prior to February 18, 2010. I disagree.

Specifically, defendants argue that by the end of December, 2005 or early 2006, plaintiff ought to have known from the company's SEC filings and press releases:  1) the type and magnitude of the accounting fraud that caused Dana to restate its financials for 2004 and the first two quarters of 2005; and 2) that the management of CVS had improperly intervened in the account function resulting in improper recording of certain transactions.

Nothing in the September 15, 2005, October 10, 2005, or December 30, 2005, press releases indicates scienter with respect to these defendants. Those releases mentioned "inappropriate

recognition of price increases," and announced that Dana's financial statements could "no longer be relied upon." [Doc. 1 at ¶78 and 82].

Similarly, Dana's restated filings with the SEC did not include facts constituting scienter as a matter of law. Those filings identified CVS as the business unit involved, identified accounting improprieties by type and magnitude, disclosed control procedure defects in CVS, admitted CVS management improperly intervened in accounting function resulting in improper recording of certain transactions related to asset sale contracts, supplier cost recovery arrangements and contract pricing changes to achieve results not in accordance with GAAP. [Doc. 56-19].

Defendant Steimle also refers to various mentions in the *Toledo Blade* and national media of the possibility of securities fraud in the CVS division at Dana, and the replacement of the leadership of that division.

Plaintiff argues convincingly that the information defendants cite was:  1) devoid of any information describing the conduct leading to Dana's restatement; 2) with the exception of Cole, failed to identify any defendant as an employee of CVS or implicate any defendant in the conduct leading to Dana's restatement; and 3) did not, in any fashion, provide factual information that defendants committed a fraud on Dana's investors.[14]

---

[14] Defendants Cole and Hodge state that it is "ironic that in defending its lack of diligence in conducting an investigation with respect to the statute of limitations, [plaintiff] dismisses as insignificant the SEC filings and other public announcements that Cole's and Hodge's employment at Dana had ended, but later argues that these terminations support a "cogent and compelling inference of scienter." That information alone does not, however support the conclusion that a reasonably diligent plaintiff would have possessed enough information to plead scienter before February 17, 2008, *as a matter of law*. Instead, the information in the SEC filings and other public announcements supports an inference sufficient to plead scienter when paired with the more detailed factual assertions in the SEC complaint obtained in September, 2009.

In light of the information on the record, a reasonably diligent plaintiff might have initiated an investigation. But this information alone is not enough to show that, as a matter of law, a reasonably diligent plaintiff would have discovered facts sufficient to plead scienter before September 11, 2009, such that a motion to dismiss would be appropriate.[15]

However, I deny defendants' motion without prejudice to litigation of the applicability of the statute of limitations, so that they may make a renewed motion for dismissal based on a more fully developed record at a later stage of these proceedings.[16]

### Conclusion

For the foregoing reasons, it is hereby:

ORDERED THAT defendants' motions to dismiss the complaint [Docs. 36, 49, 55], be, and the same hereby are denied.

So ordered.

s/James G. Carr

---

[15] As discovery must be with respect to each element of the violation, I therefore do not, and do not need to address defendants' argument with respect to when a reasonably diligent plaintiff would have known the defendants' identities.

[16] While a statute of limitations motion may, on appropriate showing, be resolved on a motion to dismiss, courts addressing this bar in securities actions have found that this fact-intensive discovery inquiry is often inappropriate for resolution on a motion to dismiss. *Roll v. Singh*, 2010 U.S. Dist. LEXIS 47498 (D.N.J. Apr. 12, 2010) (collecting cases), *accord. Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 169 (2d Cir. 2005) (noting "fact-specific nature of the limitations defense, particularly where the claim is foreclosed by inquiry notice," and recognizing that the Second Circuit has been "decidedly reluctant to foreclose such claims as untimely absent a manifest indication that plaintiffs 'could have learned' the facts underpinning their allegations" before the end of the limitations period).

Sr. United States District Judge