**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Hawaii Ironworkers Annuity                      Case No. 3:10CV371
   Trust Fund,

              Plaintiff

     v.                                       **AMENDED ORDER**

Bernard N. Cole, *et al.*,

              Defendants

       This is a suit by former shareholders of the Dana Corporation against four of the company's former officers. The gravamen of the complaint is that the three defendants worked together to falsify financial information about the financial circumstances of an important Dana unit.[1] That misinformation contributed to overly optimistic public statements by Dana officials.

       In time, Dana acknowledged the falsity of its earlier statements. It also restated past financial reports and amended its related SEC filings. Thereafter the company filed a bankruptcy petition.

       Plaintiff's suit contends defendants are primarily liable to them for the role their misconduct played in ensuing events. Defendants assert that, because they never made any statements to the investing public, no one could have relied on any statements by them. Plaintiff, they contend, improperly seeks to find them primarily liable on the basis that they aided and abetted others in perpetrating a fraud on the investing public.

       Defendants moved to dismiss. I denied that motion, stating, in part:

---

[1] This amended order corrects the number of defendants from three to four.

> Defendants contend that they were mere aiders and abettors who merely assisted the fraud perpetrated by their superiors. Viewed, however, most favorably to the plaintiff, the complaint bears a contrary reading: namely, that those who spoke directly to the investing public merely conveyed to the public the defendants' conduct that was at the heart of the fraud. While defendants' superiors could have snuffed out what the defendants had started, the fact that they did not do so does not relieve defendants of exposure to culpability as primary participants, even if they and their role was hidden in the shadows from investors' eyes.
>
> \*\*\*\*\*
>
> The complaint here alleges more than mere incidental and insignificant help in creating the falsely bright picture that others presented to the public. According to the complaint, the defendants sketched out and helped fill in that picture during the entire period it was on display. If the jury finds truth in the plaintiff's allegations, it might also find that, but for the defendants' handiwork, the public all along would have seen the real Dorian Gray.

*Hawaii Ironworkers Annuity Trust Fund v. Cole*, 2011 WL 1257756, \*8 (N.D. Ohio).

Pending are defendants' motions to reconsider my decision in light of the Supreme Court's recent opinion in *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011). [Docs. 104, 105, 107]. I agree that *Janus,* which changed the doctrine of securities liability under Rule 10b-5(b), compels reconsideration and partial reversal of my earlier opinion.

**Discussion**

The authority to reconsider denial of a motion to dismiss before final judgment has been entered is well established. *E.g.*, Fed. R. Civ. P. 54(b); *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) ("[a] court has the power to revisit prior decisions of its own . . . in any circumstance."). While a motion for reconsideration should not be used to re-litigate issues previously considered, courts traditionally will find justification for reconsidering interlocutory orders when there is: 1) an intervening change of controlling law; 2) new evidence; or 3) a need to correct a clear error or prevent manifest injustice. *Rodriguez v. Tennessee Laborers Health & Welfare Fund*, 89 Fed. App'x. 949, 959 (6th Cir. 2004) (unpublished disposition) (citing *Reich v. Hall Holding Company*, 990 F. Supp. 955, 965 (N. D. Ohio 1998)). Here, the change or clarification in the law provided by the Supreme Court's decision in *Janus* justifies revisiting my prior decision denying defendants' motions to dismiss.

### 1. *Janus Capital Group Inc. v. First Derivative Traders*

On June 13, 2011, the Supreme Court issued its opinion in *Janus Capital Group Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011). That decision concerned the liability under Rule 10b-5 of a mutual fund investment adviser, Janus Capital Management (JCM), for drafting false statements included in the plaintiff's prospectuses.

At issue in that case, as in the one at hand, is the provision of Rule 10b-5 making it "unlawful for any person, directly or indirectly, . . . [t]o make any untrue statement of a material fact" in connection with the purchase or sale of securities."[2] 17 CFR § 240.10b-5(b).

The plaintiff—Janus Investment Fund—alleged that JCM should be primarily liable for misleading statements found in certain of the plaintiff's prospectuses. JCM, as Janus Investment Fund's investment advisor, was responsible for the day-to-day management of the investment portfolio and the Funds' other business affairs, such as administrative, compliance and accounting matters. JCM drafted and reviewed the Fund prospectuses, including the allegedly fraudulent language. JCM disseminated the prospectuses through its parent company's web site. All officers of Janus Investment Fund were also officers of JCM, but only one member of Janus Investment Fund's board of trustees was associated with JCM, and thus JCM and the Janus Investment Fund were legally independent entities.

The Court of Appeals for the Fourth Circuit held that the complaint stated a viable claim for primary liability against JCM because it alleged that, by participating in the writing and dissemination of the prospectuses, JCM "made" the misleading statements in the documents.

The Supreme Court disagreed. The Court's rationale turns on an extremely limited interpretation of the verb "to make." Reading all nuance and any implication of "creating" out of the word, the Court announced that "[o]ne 'makes' a statement by stating it." It is not enough to

---

[2] While I was aware that a decision in that case was pending, I did not consider it imminent that the Court's holding, which dealt with third-party defendants, would affect the analysis of corporate insider 10(b)-5 liability. As discussed below, I was mistaken.

have drafted the statement; only the person or entity with "ultimate authority" can be found to have "made" the statement:

> For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right. One who prepares or publishes a statement on behalf of another is not its maker. And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed. This rule might best be exemplified by the relationship between a speechwriter and a speaker. **Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it.** And it is the speaker who takes credit—or blame—for what is ultimately said.

131 S. Ct. at 2302 (emphasis supplied).

The Court reasoned that the rule articulated in *Janus* properly focused on "the entity with the authority over the content of the statement and whether and how to communicate it." Without such authority, it is not "'necessary or inevitable' that any falsehood will be contained in the statement." *Janus* thus "set[] the pleading bar even higher in private securities fraud actions seeking to hold defendants primarily liable for the misstatements of others." *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 692 n. 8 (9th Cir. 2011).

## A. 10b-5(b)

### i. *Janus* and Corporate Insiders

Plaintiff contends that *Janus* should not alter my prior holding in this case for the simple reason that here defendants are corporate insiders. Because the defendant in *Janus* was a legally separate entity, plaintiff argues, the Court's rationale cannot apply to the facts at hand. Plaintiff asserts that, "[i]n essence, *Janus* involves a secondary actor" and thus "*Janus* does not analyze whether corporate executives can be liable." [Doc.108 at 8].

However, the Court "adopt[ed] a rule" that "[f]or Rule 10b-5 purposes, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus, supra*, 131 S. Ct at 2303, 2298. The Court made clear

4

that it intended its analysis to elucidate the contours of primary and secondary liability under Rule 10b-5(b). The Court determined that:

> there must be some distinction between those who are primarily liable (and thus may be pursued in private suits) and those who are secondarily liable (and thus may not be pursued in private suits). We draw a clean line between the two—the maker is the person or entity with ultimate authority over a statement and others are not. In contrast, the dissent's only limit on primary liability is not much of a limit at all. It would allow for primary liability whenever '[t]he specific relationships alleged . . . warrant [that] conclusion'—whatever that may mean."

*Id.* at 2302 n.6.

Thus, nothing in the Court's decision in *Janus* limits the key holding—the definition of the phrase "to make . . . a statement" under Rule 10b-5(b)—to legally separate entities. Instead the Court defined primary liability as requiring "ultimate authority." *Id*. The degree of separation between entities naturally will inform the analysis of where ultimate authority lies. In *Janus*, the fact of legal separation was persuasive evidence that the defendants did not have ultimate authority.

I am not the only reader of *Janus* to interpret the Court's decision this way. The dissent agreed that the Court's holding applies to corporate insiders, noting that:

> The possibility of guilty management and innocent board is the 13th stroke of the new rule's clock. What is to happen when guilty management writes a prospectus (for the board) containing materially false statements and fools both board and public into believing they are true? Apparently under the majority's rule, in such circumstances no one could be found to have "ma[d]e" a materially false statement—even though under the common law the managers would likely have been guilty or liable (in analogous circumstances) for doing so as principals (and not as aiders and abettors).

*Janus, supra*, 131 S. Ct. at 2310 (Breyer, J., dissenting).

The Court's interpretation of the verb "to make" is an interpretation of the statutory language in question in this case, and therefore cannot be ignored simply because the defendants are corporate insiders.[3] *See, e.g.*, *Local 703, I.B. of T. Grocery & Food Emples. Welfare Fund v. Regions Fin.*

---

[3] It is worth emphasizing that if plaintiff's rationale were followed to its logical conclusion, I could hold that because defendants were corporate insiders, they are liable because they created the statement. This would conflict directly with the Court in *Janus*, which held unambiguously that 'to make' does not mean 'to create': "[t]his definition, although perhaps appropriate when 'make' is directed at an object unassociated with a verb (*e.g.*, 'to make a chair'), fails to capture its meaning

5

*Corp.*, 2011 U.S. Dist. LEXIS 93873, 2-3 (N.D. Ala. Aug. 23, 2011) (upholding liability for corporate officers on the grounds that "unlike the separate legal entities in *Janus*, the defendants here are in ultimate authority over their statements."); *Curry v. Hansen Med., Inc.*, 2011 WL 3741238 (N.D. Cal. Aug. 25, 2011) (applying the ultimate authority rule to a corporate insiders).[4]

Therefore, the proper inquiry for the case at hand is whether the defendants had ultimate authority over the false statements in question.

### ii. Ultimate Authority

Plaintiff argues that even if the rationale of *Janus* extends to corporate insiders, the complaint sufficiently alleges the defendants "made" a statement in violation of Rule 10b-5(b). Plaintiff currently contends:

> • [D]efendants alone had ultimate authority over the financial results reported for Dana's CVS and Heavy Vehicle business units;
>
> • Their actions made it 'necessary or inevitable' that Dana would report falsified financial results; and
>
> • The federal disclosure laws Dana operated under dictated 'whether and how' the financial results defendants had authority over were communicated.

[Doc. 108 at 12].

---

when directed at an object expressing the action of a verb." *Id.* at 2303.

[4] Few cases have discussed the issue of liability of corporate insiders since *Janus*. The court in *In re Merck & Co., Sec., Derivative & "ERISA" Litig.*, 2011 WL 3444199, at *26 (D.N.J. Aug. 8, 2011) stated that it could not read *Janus* "to restrict liability for Rule 10b-5 claims against corporate officers to instances in which a plaintiff can plead, and ultimately prove, that those officers—as opposed to the corporation itself—had 'ultimate authority' over the statement." While I disagree with the court's stated rationale, the outcome in *Merck* is undoubtedly correct; the defendant was the speaker, the corporation was the speechwriter, and "it is the speaker who takes credit—or blame—for what is ultimately said." *Janus, supra*, 131 S. Ct. at 2302. The defendant, a very high-ranking officer at Merck spoke to the public—by signing SEC forms and being quoted in articles and reports—and then attempted to disavow liability for those statements as being under the ultimate authority of the corporation. The court found that the defendant made the statements in his capacity as Merck's Executive Vice President for Science and Technology and President of Merck Research Laboratories, and "pursuant to his responsibility and authority to act as an agent of Merck." *In re Merck, supra*, 2011 WL 3444199, at *26. As the Court noted in *Janus*, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed.

A plain meaning reading of the complaint [Doc. 1 at ¶ ¶ 10, 11, 37] gives the lie to that argument.

In plaintiff's own summary:

> beginning in 1Q04 [Dana's] CEO Michael J. Burns ("Burns") and Dana's CFO Robert C. Richter ("Richter"), imposed a mandatory 6% profit margin increase for each of Dana's plants and divisions, including the Heavy Vehicle Group and CVS. ¶10. This 6% benchmark was not based on actual or forecasted performance, but instead **came from Dana's top management as a directive** for all plants and divisions to meet. *Id.* **Plant personnel had no choice but to increase forecasts** to meet this 6% increase, even where feedback from Dana's customers confirmed that the level of growth could not be achieved. *Id.* Likewise, **division personnel refused to accept actual forecasts** provided by plant personnel if they did not reflect this 6% goal. *Id.* The pressure to meet the 6% benchmark was most intense within the Heavy Vehicle Group, and CVS in particular. ¶11 . . . . Faced with these pressures, defendants crafted numerous ways to fraudulently manipulate CVS's revenues and accounts payable to meet the 6% target and make it appear as if the Company's restructuring and cost reduction efforts were paying off. ¶¶11, 37-66.

[Doc. 60 at 5-6], citing to the complaint, [Doc. 1] (emphasis supplied).

Plaintiff adds, "Burns and Richter knew that the edict was unobtainable" and that by requiring this arbitrary numbers defendants "would have to manipulate the underlying data to generate reported profits" [Doc. 1 at ¶37(b)]. "This pressure was so severe that actual forecasts provided by plant personnel were not accepted by Dana's finance department personnel if they did not meet the pre-established benchmark." *Id*. at ¶ 10. Thus, "the increased forecasts were not based on the plant's actual performance, but instead were determined from above before a plant's budget would be accepted and approved by finance department personnel." *Id.*

Defendants were, according to the complaint and early briefing, acting in response to a mandatory directive. In plaintiff's own words, "[t]o meet the demands imposed by Dana's CEO and CFO and ensure their continued employment, defendants improperly manipulated CVS's accounting to inflate Dana's FY04, 1Q05 and 2Q05 earnings." [Doc. 60 at 6].

This description of the defendants' roles cannot be reconciled with plaintiff's current assertion that "Dana's CEO, CFO, or its Board of Directors had no discretion to alter the results that

7

defendants had sent." [Doc. 108 at 13]. The defendants sent the results that they were commanded to send.[5]

The complaint does not state a claim for primary liability under *Janus*, because the defendants did not have ultimate authority over the content of the statement.

### B. Deceptive Conduct under 10b-5(a) and (c)

In addition to the allegation that defendants made false and misleading statements in violation of Rule 10(b)5-(b), plaintiff contends that defendants are liable under 10(b)-5(a) and (c) for deceptive conduct.[6] As I noted in my earlier decision, the Supreme Court has unequivocally held that conduct can be deceptive and provide a basis for primary liability. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 158 (2008). The issue in *Stoneridge* was whether an investor could recover from a party which "neither makes a public misstatement nor violates a duty to disclose but does participate in a scheme to violate §10(b)." *Id*.

---

[5] Indeed, the proof is in the metaphorical pudding. When, in the second quarter of 2005, senior management at the corporate office noticed an unsupported asset sale in the CVS business unit, the corporate office recorded the necessary adjustments to correct the accounting before accounting and reporting for the quarter was completed. Senior management initiated an investigation, found additional incorrect accounting entries from within CVS, and eventually informed the Audit Committee of the Board of Directors. [Doc. 51 at 167, 195]. This ultimately led to the cascade of discovery and disclosures which, in turn, resulted in Dana's bankruptcy. If the defendants had had ultimate authority over the numbers they reported, the corporate office would not have had the authority to correct the unsupported asset sale defendants reported.

[6] Under 17 CFR 240.10b-5:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

In *Stoneridge* the Court held that a court could not impose Rule 10b-5 liability for deceptive actions or statements on which investors did not rely because those actions or statements had not been disclosed sufficiently in the marketplace. Defendants argue that because in this case there was neither specific attribution nor a duty to disclose they cannot be held liable.

### i. Specific Attribution

The opinion in *Janus* dealt with liability under Rule 10b-5(b), not 10b-5(a) or (c). Still, defendants argue that "*Janus* resolves any lingering doubt as to whether direct attribution is required to state a claim under Rule 10b-5(a) and (c)" because "*Stoneridge* imposed a specific attribution requirement upon deceptive conduct allegations," and the Court in *Janus* saw "no reason to treat participating in the drafting of a false statement differently from engaging in deceptive transactions, when each is merely an undisclosed act preceding the decision of an independent entity to make a public statement." [Doc. 110 at 10-11].

I disagree. The Court's language in *Janus* on which defendants rely makes no reference to attribution, and therefore defendants' argument that *Janus* "[n]oted that *Stoneridge* imposed a specific attribution requirement upon deceptive conduct allegations," is misplaced.

The full paragraph in *Janus* states:

> Adopting the Government's definition of "make" would also lead to results inconsistent with our precedent. The Government's definition would permit private plaintiffs to sue a person who "provides the false or misleading information that another person then puts into the statement." Brief for United States as Amicus Curiae 13. 8 But in *Stoneridge*, we rejected a private Rule 10b-5 suit against companies involved in deceptive transactions, even when information about those transactions was later incorporated into false public statements. 552 U.S., at 161, 128 S. Ct. 761, 169 L. Ed. 2d 627. We see no reason to treat participating in the drafting of a false statement differently from engaging in deceptive transactions, when each is merely an undisclosed act preceding the decision of an independent entity to make a public statement.

131 S. Ct. at 2303-2304.[7]

---

[7] Defendant Steimle interprets this paragraph as adopting an "ultimate authority" rule for deceptive conduct. Steimle argues that under *Janus*, "even if a person engages in deceptive conduct which eventually finds its way into the investment sphere, liability for a 10b-5 action is still limited to the person with the ultimate authority to make the statements to the investing public." [Doc. 106 at 6]. Reading the Court's decision in this strained (and illogical) way would have the effect of

9

Nothing in this paragraph suggests that *Stoneridge* required specific attribution for all 10b-5(a) and (c) claims, or that *Janus* adopts such a rule. At its most broad, the paragraph suggests that the *Janus* Court would require an independent entity's acts to be disclosed before finding liability.[8]

In fact, one can as easily read the paragraph to suggest that there may be "a reason to treat participating in the drafting of a false statement differently from engaging in deceptive transactions, when each is [not] merely an undisclosed act preceding the decision of an independent entity to make a public statement." This case does not involve independent entities—despite defendants' labored attempt to classify themselves, as employees, as independent entities from the corporation. And Dana touted HVG's results in its press releases.

The Court in *Stoneridge* did not impose a blanket specific attribution requirement on deceptive conduct claims, to be applied regardless of the relationship of the parties.[9] Instead, the Court found that the proximate relationship between the defendants' conduct and the investors' harm was "too remote to show reliance." *Id.* at 159 (concluding that in the case before it, "respondents' deceptive acts, . . . which were not disclosed to the investing public, are too remote to satisfy the reliance requirement.").

Where, as in *Stoneridge* and in *Janus*, the defendant is a legally independent third party, reliance becomes particularly difficult to show, and therefore attribution, or lack thereof, that much

---

eviscerating 10b-5(a) and (c), and therefore would violate the basic principle of statutory interpretation that courts should "give effect, if possible, to every clause and word of a statute," and so avoid rendering superfluous any statutory language. *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883); *see also Bailey v. United States*, 516 U.S. 137, 146 (1995) ("we assume that Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning") (rejecting interpretation that would have made "uses" and "carries" redundant in statute penalizing using or carrying a firearm in commission of offense).

[8] Even such a reading would likely be dictum.

[9] And if it had, the decision in *Janus* would not have been necessary for defendants to make this argument.

more significant. I have already found that plaintiff sufficiently alleged reliance under 10b-5(a) and (c).[10]

Because *Stoneridge* did not hold that attribution is always necessary for Rule 10b-5(a) and (c) claims, I cannot read the *Janus* Court's vague affirmation of *Stoneridge* to do so either.[11]

### ii. Duty to Disclose

Defendants also argue that I should reconsider my early holding because the defendants had no duty to disclose their alleged deceptive conduct, and a "duty of disclosure [is] necessary to support primary Section 10(b) claims." [Doc. 110 at 8].

But defendants can cite no binding caselaw espousing such requirement for all 10b-5(a) or (c) claims outside of an omissions case.[12] The Sixth Circuit, in *Benzon v. Morgan Stanley Distribs.,*

---

[10] The Court in *Stoneridge* found reliance lacking in part because "nothing made it necessary or inevitable for [the independent third party] to record the transactions as it did." I have found that the defendants did not have ultimate authority over plaintiff's public disclosures sufficient to plead under 10b-5(b), but I do not change my holding that plaintiff sufficiently pled reliance on defendants deceptive conduct under 10b-5(a) and (c). I do not find these mutually exclusive, as plead by plaintiff, defendants' conduct had a much closer and clearly proximate relation to the plaintiff's injury than then that in *Stoneridge*. The Court in *Janus* did not purport to overrule *Stoneridge*, or indeed to address violations of 10b-5(a) and (c).

[11] Nor does the attribution language in *Janus* suggest such a thing: "And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed." *Janus, supra*, 131 S. Ct. 2302. The Court also noted that it "need not define precisely what it means to communicate a 'made' statement indirectly . . . but attribution is necessary." *Id.*, at 2305 n.11. That holding is clearly limited to defining the scope of "making" a statement under 10b-5(b).

[12] I note that, though not cited by the defendants, the Fifth Circuit had, before *Stoneridge*, limited the reach of § 10(b) and Rule 10b-5 to a material misrepresentation or omission where there is a recognized duty to disclose. *See, e.g., Regents of University of California v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 384 (5th Cir. 2007) ("'[D]eception' within the meaning of § 10(b) requires that a defendant fail to satisfy a duty to disclose material information to a plaintiff."). Whether that holding survives *Stoneridge* is unclear, and in any case, *Regents University* is not binding. *See, Newby v. Enron Corp. (In re Enron Corp. Secs.)*, 610 F. Supp. 2d 600, 609 at n. 4 (S.D. Tex. 2009) (explaining that the Fifth Circuit had adopted language from the Eight Circuit in *Charter In re Charter Communications, Inc. Sec. Litig.*, 443 F.3d 987, 992 (8th Cir. 2006), and "[a]lthough the Supreme Court affirmed *Charter* in *Stoneridge*, it did so on other grounds; the high court emphasized that in an omissions case, to trigger an *Affiliated Ute* [*v. United States*, 428 U.S. 128 (1972)] presumption of reliance there must be a duty to disclose, while for a fraud-on-the-market presumption there must be communication of the defendant's deceptive acts to the public and reliance by the plaintiffs on those acts to provide the requisite causal connection between the defendant's acts and the plaintiffs' injury."). I found that defendants' deceptive acts in

11

*Inc.*, 420 F.3d 598, 610 (6th Cir. 2005), held that "a defendant 'not liable under Rule 10b-5(b) for failure to disclose . . . may still be held liable under Rule 10b-5(a) and 10b-5(c) as a participant in [an] allegedly fraudulent scheme.'" (Quoting *Scholnick v. Schecter*, 752 F. Supp. 1317, 1323 (E.D. Mich. 1990)).

The Court's decision in *Stoneridge* is entirely consistent with *Benzon*. The Court in *Stoneridge* examined the issue of "when, if ever, an injured investor may rely upon § 10(b) to recover from a party that neither makes a public misstatement nor violates a duty to disclose but does participate in a scheme to violate § 10(b)." 552 U.S. at 159. The Court concluded that "[c]onduct itself can be deceptive"; there need not be "a specific oral or written statement before there could be liability under § 10(b) or Rule 10b-5." *Id.* at 158.

Courts interpreting Rule 10b-5 since *Stoneridge* have continued to find that a plaintiff need not allege a disclosure violation to plead a cause of action under Rule 10b-5(a) and (c). *E.g.*, *Clayton v. Heartland Res., Inc.*, 754 F. Supp. 2d 884 (W.D. Ky. 2010); *In re Nat'l Century Fin. Enters., Inc. Fin. Inv. Litig.*, 553 F. Supp. 2d 902, 908 (S.D. Ohio 2008); *In re Able Laboratories Sec. Litig.*, 2008 WL 1967509, at * 18 (D.N.J. Mar. 24, 2008); *New York City Emples. Ret. Sys. v. Berry*, 616 F. Supp. 2d 987, 995-996 (N.D. Cal. 2009) (finding sufficient under 10b-5(a) and (c) "allegations of the systematic perpetration and concealment of improper stock option granting practices by a high-level corporate insider, who is also alleged to have had a role in the dissemination of false financial information.").

Nothing in *Janus* alters the landscape of 10b-5(a) and (c) violations to add a duty to disclose requirement.

## Conclusion

It is, therefore,

---

this case were communicated to the public through Dana's press releases and that plaintiff relied on those acts.

ORDERED THAT defendants' motions for reconsideration (Docs. 104, 105, 107) be, and the same hereby is granted in part and denied in part.

The Clerk shall schedule a telephonic status/scheduling conference.

So ordered.

/s/James G. Carr
United States District Judge